HARDEN F. TAYLOR AND ELLA W. TAYLOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 99262. Promulgated February 12, 1941.

*Charles Kurz, C. P A.*, for the petitioners.
*Allen T. Akin, Esq.*, for the respondent.

### OPINION.

MURDOCK: The Commissioner determined a deficiency of $3,785.47 in the income tax of these petitioners for the calendar year 1936. The Board adopts the stipulation of the parties as a part of its findings of fact.

The first issue is whether the exchange by Taylor in 1936 of 600 shares of Pressed Steel Car Co. 7 percent preferred stock for shares of stock and rights in the Pressed Steel Car Co., resulted in a recognized gain.

The Pressed Steel Car Co., hereinafter called the old company, was placed in the hands of receivers in 1933 after default on its 5 percent debenture bonds due in that year. A plan of reorganization was filed with the court on October 14, 1935, and was amended on December 23, 1935. The court approved the plan on July 27, 1936.

The stock of the old company consisted of 136,015 shares of 7 percent preferred stock and 411,204 shares of common stock. Its indebtedness included, *inter alia*, $3,000,000 face amount of 10-year 5 percent convertible debenture bonds due January 1, 1933, and accrued interest of $525,000, and $387,500 face amount of 15-year 5 percent convertible debenture bonds due January 1, 1943, and accrued interest of $58,125.

The plan contemplated that a new company, the "Pressed Steel Car Company, Inc.," hereinafter called the new company, would be organized and the stock and debentures of the old company mentioned in the preceding paragraph would be exchanged by the holders thereof for stock and debentures of the new company. The new company was organized and the properties of the old company were transferred to it by the trustees of the old company on July 29, 1936. The new company at the same time transferred to the trustees $4,274,256.83 principal amount of its 15-year 5 percent debentures, 81,602.04 shares of its convertible 5 percent second preferred stock, and 268,706.9 shares of its common stock. The new company also agreed to assume some remaining obligations and liabilities of the old company.

The plan of reorganization contemplated that at least $1,750,000, but not more than $2,150,000, of new money would be raised by the

sale of the first preferred stock of the new company at $5 per share. A new interest, the General American Transportation Corporation, had agreed to purchase 350,000 shares of that stock at $5 per share and was to receive 30,000 shares of common stock of the new company as a bonus.

The old stockholders were given the right to subscribe for the new first preferred stock. Their rights to subscribe had to be exercised prior to February 24, 1936, under options which were stated as follows:

(c) Any stockholder may subscribe under Option I or Option II or both. Under Option I, 430,000 shares of First Preferred Stock will be available for subscription, but unless at least 350,000 shares are subscribed for no subscriptions under Option I will be accepted, and deposits in respect of such subscriptions will be refunded, but without interest. Under Option II, not less than 350,000 shares of First Preferred Stock are to be purchased by General American and its associates and 80,000 shares will be available for subscription by stockholders. Subscriptions under Option II will not be accepted if subscriptions under Option I are accepted nor will subscriptions under Option I be accepted if subscriptions under Option II are accepted.

The court, in approving the plan on July 27, 1936, stated that only 113,365.8 shares had been subscribed for under option I and, therefore, it was not effective, so that General American was required to purchase the 350,000 shares of the new preferred stock. It further found that the subscriptions for the new preferred stock by the old stockholders would be effective under option II for 80,000 shares.

The securities received by the trustees of the old company (except 30,000 shares of common stock) were delivered by them on October 14, 1936, for distribution to the security holders of the old company pursuant to the plan. The 30,000 shares of common stock of the new company were at the same time delivered to General American. All of the second preferred stock was issued to the holders of the old 7 percent preferred stock. The 238,706.9 shares of common stock were issued to the holders of the old 7 percent preferred stock and to the holders of the old common stock, and the $4,274,256.83 principal amount of bonds of the new company were distributed to the holders of the bonds of the old company and to some general creditors of the old company. The old securities were taken in exchange for the new.

Certificates for 350,000 shares of the new first preferred were issued on October 14, 1936, to General American, which in turn made available somewhat in excess of 80,000 of those shares to stockholders of the old company who had subscribed for those shares.

The petitioner owned 600 shares of the old 7 percent preferred stock. He exchanged those shares pursuant to the plan on October 19, 1936, for 360 shares of the new 5 percent second preferred, 600 shares of the new common, and 600 rights to purchase the new first preferred at $5 per share. He thereby realized a gain in an amount which is not

in dispute. The Commissioner has held that his gain must be recognized for income tax purposes.

All of the three classes of stock of the new company were voting stock.

The decision depends upon whether or not there was a reorganization within the definitions given in section 112 (g) (1) of the Revenue Act of 1934, as amended by section 213 (g) of the Revenue Act of 1939. The petitioner exchanged his stock in the old company solely for stock and securities in the new company pursuant to the plan and thus, if there was a reorganization, section 112 (b) (3) applies and the petitioner's gain is not recognized.

The change from the old company to the new company was for a business purpose and not to avoid taxes. *Gregory* v. *Helvering*, 293 U. S. 465. There was complete continuity of interests. All of the old stockholders and even all of the old creditors had an interest in the new corporation. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462; *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937. The change was made necessary because the old bonds were past due and in default. The change was largely one of form. Thus, the transition was within the spirit and general purpose of the nonrecognition provisions. Of course, the transaction must come also within the letter of the definitions before any one of the nonrecognition provisions applies.

The petitioner contends that the transition from the old company to the new company was within two of the definitions given, one in the first part of (B) and the other in (C). They are as follows:

(B) the acquisition by one corporation, in exchange solely for all or part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; * * * (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred.

Control here means 80 percent of the stock.

The first contention of the petitioner is that the new company acquired all of the properties of the old company solely in exchange for its stock within the meaning of (B). The real question is whether the issuance of its bonds by the new company in exchange for the bonds of the old company may be regarded as the assumption of the liability of the old company within the meaning of (B) rather than an exchange of those bonds for the properties of the old company. The agreement expressly provided that the new company would assume some of the debts of the old company, but did not use the word "assume" in connection with the two outstanding bond issues. The

proceeding under 77B of the Bankruptcy Act was necessitated by default on the past due bonds of the old company. A mere statement by the new company that it assumed the obligation of the old company on its bonds would have been insufficient because they would have remained in default. Thus, a new bond issue had to be substituted for the old issue. That was one of the chief purposes and one of the chief accomplishments of the plan. The new company in effect did assume the bonded indebtedness of the old company, since it put itself in the place of the old company and agreed to pay the amount of principal and interest owed by the old company to the very same creditors, the holders of the old bonds. Thus, unless there is some magic in the use of the word "assume", the present case comes within the statute.

The 1939 amendment made a change in the language of (B) relating to this kind of reorganization. The purpose of the change was explained as follows in the report of the Ways and Means Committee, 76th Congress, 1st session, Rept. No. 855, p. 19:

\* \* \* The recent Supreme Court case of *United States* v. *Hendler* (303 U. S. 564 (1938)) has been broadly interpreted to require that, if a taxpayer's liabilities are assumed by another party in what is otherwise a tax-free reorganization, gain is recognized to the extent of the assumption. In typical transactions changing the form or entity of a business it is not customary to liquidate the liabilities of the business and such liabilities are almost invariably assumed by the corporation which continues the business. Your Committee therefore believes that such a broad interpretation as is indicated above will largely nullify the provisions of existing law which postpone the recognition of gain in such cases. To enable bona fide transactions of this type to be carried on without the recognition of gain, the committee has recommended Section 213 of the bill.

The present transaction would seem to come within the intent of Congress. The new company acquired substantially all of the properties of the old company solely in exchange for its stock and at the same time substituted its bonds for the liability of the old company on the old bonds.

We have not overlooked the argument of the respondent that a substantial part of the assets of the old company were not acquired. He refers to a provision of the plan whereby the trustees retained $750,000 of cash in their hands to be applied pursuant to the order of the court to the payment of principal and interest on trustees' certificates, taxes, other obligations of the trustees, costs of administration, and the expenses of reorganization. Any amount not required from the fund for those purposes was to be paid over to the new company in a final accounting. The properties of the old company, as indicated by the Commissioner's own valuation of the stock of the new company, were worth more than ten times as much as the amount retained. This fact, and the purposes for which the amount was

568

retained by the trustees, leaves no doubt that the new company acquired substantially all of the properties of the old company within the meaning of section 112 (g) (1) (B). We need not pass upon the alternative contention made by the petitioner that 112 (g) (1) (C) applies. However, it seems obvious to us that the control in the old stockholders required by (C) was lacking at the conclusion of this plan. The petitioner's argument that there was a time when the old stockholders were entitled to the new common, the new second preferred, and to rights to purchase all of the new first preferred, is not supported by the facts.

The next issue is whether the petitioner's loss from the disposition of a piece of real estate was an ordinary or a capital loss. The amount of the loss is not in dispute. The petitioner purchased the property in 1932, paying $10,500 in cash and executing his notes and a mortgage for the balance of $22,000. He later paid $2,000 on the mortgage. A foreclosure suit was threatened when he defaulted on the interest due in 1935. He thereafter in 1936 reconveyed the property to the mortgagees. There was no actual consideration in cash paid to Taylor in connection with the reconveyance.[1] But the mortgagees surrendered the bonds and mortgage and canceled the remaining unpaid indebtedness. Thus, the petitioner gained something in the deal and did not merely abandon his interest in the land. The transaction was a "sale or exchange" and the loss was a capital loss. *Helvering* v. *Hammel*, 311 U. S. 504; *Commissioner* v. *Electro-Chemical Engraving Co.*, 110 Fed. (2d) 614; affd., 311 U. S. 513; *Rogers* v. *Commissioner*, 103 Fed. (2d) 790; certiorari denied, 308 U. S. 580; rehearing denied, 308 U. S. 635; *Pender* v. *Commissioner*, 110 Fed. (2d) 477.

The final issue is raised by the Commissioner. It is whether gains were realized in 1936 or in 1937 from sales made on the last two days of December 1936. Each resulted in a profit. The securities were not delivered until January 4 and 5, the settlement dates, and thereafter Taylor received the proceeds of the sales. He was on a cash basis. The gains were not income to him in 1936. He did not realize his gains until he was paid the selling price in 1937. This is unlike cases wherein it was held that losses were sustained at the time a binding agreement to sell was entered into, e. g., *Dee Furey Mott*, 35 B. T. A. 195; *C. R. Dashiell*, 36 B. T. A. 313; affd., 100 Fed. (2d) 625. A loss is sustained by reason of the agreement, but income is received only when the cash comes to hand or is constructively received in some way. Section 42.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

[1] This is a finding of fact made from testimony.