William F. Pohlen v. Commissioner. Katherine Pohlen v. Commissioner.
Pohlen v. Commissioner
Docket Nos. 6879, 6880.
United States Tax Court
1947 Tax Ct. Memo LEXIS 288; 6 T.C.M. (CCH) 229; T.C.M. (RIA) 47055; February 27, 1947
Muckleroy McDonnold, Esq., 503 Nat. Bank of Commerce Bldg., San Antonio, Tex., for the petitioner. Donald P. Chehock, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax and negligence penalties for the year 1943 as follows: Docket No.
Deficiency
Penalty
6879
$2,815.24
$164.22
6880
2,825.91
164.75 Both the deficiencies and the penalties are contested. The year 1942 also is before us by reason of the provisions of the Current Tax Payment Act of 1943. There is a companion case to these proceedings, William F. and Katherine Pohlen, Docket No. 6878 [6 TCM 226,], involving income tax liability and a fraud penalty for 1939. Findings of Fact William F. Pohlen, hereinafter referred *289 to as the petitioner, and Katherine Pohlen, are husband and wife, residing in San Antonio, Texas. They filed a joint return for 1942 and separate returns for 1943 with the Collector for the First District of Texas. In their separate returns each reported onehalf of their community income. For many years the petitioner has been engaged from time to time in soliciting funds for various Catholic charities. He entered into a contract dated May 14, 1941, with the Valley Orphanage and Vocational Training School of Harlingen, Texas (later called Santa Rosa Orphanage and Vocational Training School) through its president, M. H. Coleman, and its secretary, Ruth Coleman, under which he was to conduct a soliciting campaign on behalf of the Orphanage to raise funds for new buildings and improvements. The petitioner was to be paid, out of the funds collected, a salary of $300 per month and two and one-half cents for each letter mailed out, plus any additional postage used. The rate per letter was later increased to three cents. The Orphanage was to have no liability for these expenses except out of the funds collected. It had the right to terminate the contract at its own option if at the close *290 of 1941 it had not received from the campaign as much as $1,000 over and above the expenses paid out. The contract further provided that the funds as collected were all to be deposited in an account at the First National Bank of Mercedes, Texas, in the name of "Santa Rosa Orphanage Expense Account" and were to be withdrawn only by checks signed by both parties to the agreement. It was understood by the parties, although not provided for in the contract, that the petitioner was to furnish all of the office equipment, mailing lists, labor, and supplies for the campaign. The petitioner operated under this contract until March 31, 1944. On January 15, 1943, the parties thereto entered into a new contract under which the petitioner agreed to sell, and the Orphanage agreed to purchase, for a consideration of $12,000, "the Seller's complete mailing lists, office machinery, equipment, office furniture, and good will". The contract provided that: 3. Of the aforesaid purchase price of $12,000.00, the sum of One Thousand Dollars ($1,000.00) is to be paid as a down payment and the further sum of One Thousand Dollars ($1,000.00) is to be paid out of the proceeds of an insurance claim in favor *291 of the aforesaid Santa Rosa Orphanage and Vocational Training School promptly upon settlement of such claim, said claim being now in process of settlement. 4. The balance of Ten Thousand Dollars ($10,000.00) shall be paid from the moneys which normally would be payable to the aforesaid Orphanage and School under that certain contract dated May 14, 1941, between Valley Orphanage and Vocational Training School of Harlingen, Texas (the former name of the aforesaid Santa Rosa Orphanage and Vocational Training School) and the aforesaid W. F. Pohlen, which said contract the Buyers (as President and Secretary of the said Santa Rosa Orphanage and Vocational Training School, thereunto duly authorized) and the Seller extend until there shall have been paid to the Seller all moneys owing to him hereunder; but until all such moneys are fully paid to the Seller he shall continue to have and receive also the salary, postage allowance and the allowance for rent for office space, water, lights and heat provided for in the said contract of May 14, 1941. 5. The value of the dollar with respect to the aforesaid total sum of Twelve Thousand Dollars ($12,000.00) is based on the price of a bushel of *292 cash wheat quoted at the close of the business day January 15, 1943, on the Chicago wheat exchange. If on the day of final settlement the bushel of cash wheat has risen to a higher price than that quoted on January 15, 1943, the increase in price shall be added to the said sum of $11,000.00, but such increase shall be pegged at $1.75 per bushel. 6. The Buyers shall have the right at any time to pay off any balance owing under this contract and at such time may designate the place of delivery of the aforesaid lists, machinery, equipment, and furniture. 7. It is distinctly understood and agreed that the Seller shall retain the title and possession of the said mailing lists, office machinery, equipment and furniture, good will and all names of benefactors until full payment of the amount owing to the Seller hereunder. 8. The Seller agrees to accept a saleable note for a part of the total amount owing to the Seller (the same being subject to the protection of the dollar value), the payment of said note to constitute the final payment under this contract. The petitioner kept accounts and made monthly reports on the mailing campaign in 1942 and 1943 which showed, month by month, *293 the gross receipts, expenses, and net receipts accrued both to himself and to the Orphanage. These reports show that the petitioner's net receipts amounted to $5,004.37 in 1942 and $4,972.43 in 1943. His gross receipts included salary of $300 per month, plus the excess of the amounts received for letters mailed over the expenses incurred in mailing them. The expenses covered such items as salary (for petitioner's employees), stamps, paper, envelopes, addressograph, and miscellaneous. In February, 1942, there was deducted an item of $367.35 for a new office building and also in December, 1942, an item of $885 for "Lists purchased from Rev. J. J. Pohlen". The petitioner received payments under the contract of sale of January 15, 1943, as follows: January 23
$ 1,000.00
March 8
298.33
April 6
1,198.72
May 9
2,399.90
July 12
1,064.17
September 8
1,479.33
October 4
741.24
December 4
897.98
January 3, 1944
5,652.07
March 31, 1944
445.98
Total
$15,177.72
The employment contract of May 14, 1941, terminated with the last of the above payments. At that time the petitioner turned over to the Orphanage the mailing lists and office equipment and supplies *294 called for in the sale contract, including 55,000 addressograph name plates. The petitioner purchased some of the names for his mailing lists from his brother, J. J. Pohlen, a Catholic priest living in South Dakota, and some from concerns making a business of selling such lists. The current price of lists was from one cent to three cents a name. The petitioner kept card records of the names and addresses of all persons who made a contribution to the campaign up until the consummation of the sale contract, March 31, 1944. He retained these card records after termination of the contract. The petitioner also purchased from his brother a multigraphing machine and other office equipment. He made payments to his brother of $500 in 1941, $885 in 1942, $4,000 in 1943, and $1,170 in 1944. It is stipulated that the machinery and equipment sold to the Orphanage exclusive of the mailing lists had an undepreciated cost basis to the petitioner of $464.76. In his return for 1943 the petitioner reported a long-term capital gain of $1,799.27 computed as follows: Capital gain from sale of stock (1/2 of
$426.77)
$ 213.39
Capital gain from sale of business (1/2
of $10,652.72)
5,326.36
Capital loss carried forward from 1942
return
3,740.48
Net capital gain
$1,799.27
*295 The capital loss item of $3,740.48 carried forward from 1942 was the unused portion of the capital loss resulting from the sale of stocks in 1941 which was first reported in the joint return filed by petitioner and his wife for that year. The petitioner also reported in his 1943 return dividends of $2,375 and gross receipts from business ("advertising") of $4,972.43, the amount shown as his profit for that year in the reports made on the Orphanage campaign from which he deducted depreciation of $3,300, leaving a net income from business of $1,672.43. The return showed total income on line 10 of $5,846.70. The petitioner's wife, Katherine Pohlen, filed a separate return for 1943 which contained the same items of gross income and deductions as that filed by the petitioner. However, in computing their separate taxes she and the petitioner each took one-half of the community net income thus shown. In their joint return for 1942 the petitioners reported as their total gross income $5,004.37, shown as the profits from the Orphanage campaign for that year. They claimed deductions of $1,627.46 which included "depreciation and repairs" on office equipment of an alleged value of $5,000. *296 There was omitted from the return, without any explanation, $1,475 of dividends received in that year and $750 received from a soliciting campaign which the petitioner formerly conducted on behalf of "St. Leo's Abbey". In November, 1943, after an investigation by a revenue agent, the petitioners filed an amended joint return for 1942 in which they included the $1,475 of dividends in gross income but deducted a like amount for depreciation, leaving no additional tax due. In his deficiency notice for 1943 the respondent allowed $169.98 for depreciation and repairs on equipment. At the hearing of these proceedings he conceded that the petitioners are entitled to an additional depreciation of $107.05 claimed in their petitions. The deficiency notice also shows the disallowance of the following items which the petitioners deducted in computing their net income from business: Federal income tax
$ 421.40
Automobile seat covers
23.00
Adding machine
22.00
Post cards (April)
200.00
Payments to minor son
102.05
Driveway repairs (personal residence)
21.50
Excessive depreciation
3,185.00
The petitioners' returns for 1942 and 1943 were prepared and filed by persons *297 whom they employed for that purpose from advertisements in newspapers. The petitioners had no knowledge of, and did not make any investigation of, the qualifications of these persons. The petitioners were negligent in filing their returns for both the years 1942 and 1943. Opinion One of the allegations of error contained in the original petitions, which are identical in both docket numbers, is that the respondent erred in treating the total consideration received under the contract of sale of January 15, 1943, as income of the taxable year 1943, whereas only $9,079.67 was actually received in that year. The balance of the sale price, $6,098.05, was paid to the petitioners in 1944. We think that the petitioners must be sustained on this issue. The petitioners made their returns on a cash basis. A taxpayer reporting on a cash basis is in receipt of taxable income only when he actually or constructively receives cash or its equivalent in other property. See Helvering v. Nibley-Mimnaugh Lumber Co., 70 Fed. (2d) 843; Harden F. Taylor, 43 B.T.A. 563. The taxpayers here received nothing in 1943 from the sale in question except the cash payments aggregating *298 $9,079.67. Although in the sale contract the seller agreed to accept a saleable note for a part of the purchase price in final payment thereof there is no evidence that any such note was ever issued or that any portion of the purchase price was ever paid in any other type of property than cash. The respondent has not determined that it was and does not so contend now. The sale contract specifically provided that the deferred payments were to be made * * * from the moneys which normally would be payable to the aforesaid Orphanage and School under that certain contract dated May 14, 1941 * * * which said contract the Buyers * * * and the Seller extend until there shall have been paid to the Seller all moneys owing to him hereunder; * * * If there had not been sufficient funds collected from the campaign after the close of 1943 the balance of the sale price might never have been paid to the petitioner. Under the contract the seller retained title to and possession of the properties sold until the purchase price was fully paid. On these facts we do not think the petitioners should be taxed in 1943 on any more than they actually received in that year. The petitioners contend, further, *299 that in computing the gain from the sale of their business and assets to the Orphanage they are entitled to use a cost basis of $6,055 for the mailing lists; that the gain from the sale should be taxed as a long-term capital gain under the provisions of section 117, Internal Revenue Code; and in the alternative, that they are entitled to depreciation deductions equal to one-third of the cost of the mailing lists in each of the years 1942 and 1943. In his deficiency notice the respondent determined that the office equipment was sold at its depreciated cost of $464.76 and that the balance of the proceeds of the sale constituted taxable income. He further determined that since the petitioner retained a copy of the key-names on the mailing lists for his own use no cost basis attached to the lists sold. It is difficult to determine from the evidence just what the facts are relative to the petitioner's acquisition of the mailing lists or his disposal of them as a separate property. He testified that he purchased the names from his brother, the Reverend J. J. Pohlen, and from other sources, and that "at some time" he had given his brother a promissory note for $4,000 *300 for such lists which he later paid off with bonds and cash. He put in evidence a letter showing delivery to his bank on December 8, 1943, for transmittal to his brother, $3,000 face amount of U.S. Government Bonds and also two cancelled checks, one for $1,000 and one for $1,170, made out to his brother, dated December 9, 1943, and December 30, 1944, respectively. We do not know when the petitioner gave his brother the $4,000 note and we have only his unsupported statement at the hearing that this note was given for lists of names. We do not know whether these lists were acquired for this particular campaign on behalf of the Santa Rosa Orphanage or whether they were names used in some of the previous campaigns which the petitioner conducted. The petitioner testified that he kept card records of the names of all persons who responded to his letters up until sometime in 1944 and that he retained those cards in his possession after transferring the other lists and equipment to the Orphanage. We do not know how many such names were retained by the petitioner nor is there any possible way of allocating cost to them and to the names sold. The petitioner is, of course, not entitled to deduct *301 the cost basis of the names which he retained for his own use. Since we do not know when the petitioner acquired the lists sold or what the cost to him was we can not determine what amount, if any, he is entitled to have returned to him as cost, or what depreciation deductions he might be entitled to take on them. The petitioners allege in their petitions that the respondent erred in failing to eliminate "profit for rent" in the amount of $161.60 which they erroneously reported in their 1943 returns. There is no evidence before us from which we can determine sufficient facts to make any ruling upon this question. A further issue relating to the disallowance of depreciation on certain equipment in the amounts of $107.05 in 1942 and $45.05 in 1943 was conceded by the respondent. The only remaining issue is whether the petitioners are subject to the 5 per cent negligence penalty under section 293(a), Internal Revenue Code, which the respondent has asserted for 1942 and 1943. The evidence leaves no room for doubt that the petitioners were grossly negligent in the preparation and filing of their returns for both years. In their 1942 joint return dividends *302 of $1.475 and other income of $750 were entirely omitted. There was no explanation of the omission of the dividends. The petitioner stated that the $750 item was omitted because he made no profit on the contract under which that was received. When the matter was brought to their attention by a revenue agent the petitioners filed an amended return in which they reported the $1,475 of dividends but deducted a like amount for depreciation, leaving no increased tax liability In computing income from business in both years there were deducted a number of items which were plainly capital expenditures, such as the cost of a new office building for which $367.35 was deducted in February, 1942. In computing his business income for 1943 the petitioner deducted an item of $421.40 for federal income taxes which was not shown on the returns but was reflected in the business income reported therein. There was deducted on the returns an item of $3,470.48 designated "Capital Loss carried forward from 1942 Tax Return". There was no statutory authority for such a deduction. The only explanation that the petitioner offered for these and other discrepancies in the returns was that he had entrusted *303 the preparation of the returns to persons whom he had engaged for that purpose. Taxpayers must, of course, assume responsi bility for their returns even though they employ others to prepare them. On the facts, the respondent is sustained in assessing the negligence penalties. Decision will be entered under Rule 50.