**OLD COLONY TRUST ASSOCIATES v. HASSETT, Collector of Internal Revenue.**

**No. 4065.**

Circuit Court of Appeals, First Circuit.

May 18, 1945.

Hugh D. McLellan, of Boston, Mass. (George R. Blodgett, Kenneth W. Bergen, and Herrick, Smith, Donald, Farley & Ketchum, all of Boston, Mass., of counsel), for appellant.

Fred J. Neuland, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and Robert N. Anderson, Sp. Assts. to Atty. Gen., and Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., of counsel), for appellee.

Before MAHONEY, and WOODBURY, Circuit Judges, and FORD, District Judge.

FORD, District Judge.

This is an appeal from a judgment, claimed inadequate, of the district court in favor of the appellant in a suit for the recovery of federal income and excess profits taxes paid for the calendar years 1935 and 1936. The facts for the most part have been stipulated by the parties.

The taxpayer, Old Colony Trust Associates, is and was during the tax years of 1935 and 1936 a bank investment trust and a corporation within the meaning of the internal revenue laws.

On July 26, 1932, the appellant owned 30,345 shares of the 75,000 outstanding shares of the Everett Trust Company, a Massachusetts banking corporation. On the date referred to, practically the lowest point of the then existing depression, the Everett Trust Company (hereinafter referred to as the Old Bank) was, and had been for several months before that date, insolvent; its closing was imminent. The appellant faced a possible assessment in the amount of $303,450, and the other stockholders faced a proportionate assessment upon their stock. In the spring of 1932 Mr. F. W. Denio, vice-president and secretary of the appellant, discussed the financial condition of the Everett Trust Company with the Massachusetts Bank Commissioner and as a result a plan of reorganization of the Everett Trust Company which included the organization of a new bank to be known as the Everett Bank and Trust Company (hereinafter referred to as the New Bank) was formulated. The purposes sought to be accomplished by the plan were to pay

the depositors of the Old Bank, forestall impairment to the large stock holdings of the appellant in other banks in Greater Boston, and relieve the taxpayer of a possible assessment upon its stock in the Old Bank. An essential element of the plan was a loan by the taxpayer to the Old Bank of $900,000 for which the Old Bank was to give its demand note secured by certain readily marketable securities composed of shares of stock in leading industries, banks, public utility and railroad holding companies held in the portfolio of the Old Bank. The plan provided that the New Bank would take over all of the assets of the Old Bank including the equity in the stocks to be pledged under the $900,000 loan, the New Bank to assume all the liability of the Old Bank except its liability on the $900.000 loan. Also under the plan the stockholders of the Old Bank were given the right to subscribe for not more than 20,000 shares of the capital stock of the New Bank. The taxpayer agreed to subscribe to an equal aggregate number of shares subscribed for by the other stockholders of the Old Bank and to underwrite enough additional shares to make the total issue of the New Bank at least 20,000 shares.

In accordance with the plan. the appellant on July 26, 1932 loaned to the Old Bank $900,000 for which it took a six per cent. demand note of the Old Bank secured by securities which had an aggregate market value on the date of the loan of $247,683.50. At their respective highs in previous years these securities had a market value of $2,089,467.06 and had cost the Old Bank $1,208,935.90.

The demand note contained provisions regarding the foreclosure of the pledge, but permitted the holder of the note to bid in the collateral only if the foreclosure was by public sale.

The $900,000 loan was set up on the taxpayer's books as of July 26, 1932 as "Note Receivable" and later, on December 28, 1932, changed to "Demand Note of Everett Trust Company, secured by collateral." (On the balance sheets of December 31, 1934 and December 31, 1935, the demand note was carried at the net value representing the quoted market value of the collateral security.)

On July 26, 1932, the date of the loan, the New Bank was incorporated with an authorized capital stock of 20,000 shares of the par value of $10 per share, and pursuant to the plan the taxpayer subscribed to 16,794 shares at a cost of $335,880. The assets of the Old Bank, including the $900,000 received from the taxpayer, the equity in the securities pledged to the appellant, were transferred to the New Bank, and the latter assumed the liability to depositors and other creditors of the Old Bank, except the liability of the Old Bank to the taxpayer on the $900,000 demand note. The New Bank carried on the business of the Old Bank in the same quarters. The Old Bank ceased doing business.

The appellant registered the shares transferred to it as security by the Old Bank in each instance as follows: "Old Colony Trust Associates, Pledgee under demand note of Everett Trust Co. dated July 26, 1932." The dividends received by the taxpayer on the collateral securities were treated on its books and in its tax returns for the years 1932 to 1936, inclusive, as interest income. No proxies were ever sent in by the appellant to the respective companies represented in connection with any of the collateral securities.

In accordance with its rights under the demand note the taxpayer sold a portion of the collateral in 1934 for $104,806.83; in 1935 it sold part of the securities pledged for $377,485.38; the remaining portion of the collateral was sold in 1936 for $47,261.-13, and these respective amounts were applied in reduction of the note. This left an unpaid balance on the note amounting to $370,446.66, which the appellant deducted as a bad debt on its income tax return for 1936.

The Commissioner determined that the appellant realized taxable gains within the provisions of Sections 111(a) and 113(a) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts pages 691, 696 and 854, 859, upon the sale of the collateral in 1935 and 1936 of $218,282.88 and $24,168.-63, respectively, the difference between the sales price and the market value of the securities on July 26, 1932. The Commissioner also disallowed the taxpayer's bad debt reduction of $370,446.66 claimed by the appellant in its 1936 return.

The district court decided the two questions now remaining in this suit against the appellant, taking the position with respect to the taxpayer's alleged taxable gains in 1935 and 1936, that the transaction of July 26, 1932 "served factually to transfer the ownership of the securities to the plaintiff," and, therefore, it realized taxable gains on

the sale of the collateral in the years 1935 and 1936.

■ Since profits on sales are taxed only to the owner of the property sold, it follows that if the appellant was merely a pledgee of the securities in question, any profits on the sales of the securities in 1935 and 1936 cannot be taxed to it. A pledgee who has not foreclosed has only a special interest or property in the stock during the continuance of the pledge. The pledgor retains the title and gains from sales of the collateral are taxed to the pledgor. Cf. I.T. 2897, XIV-1 C.B. pp. 144, 145; Ethel Burns v. United States, D.C.Cal.1940, 61 F. Supp. 312; W. L. Moody Cotton Co. v. Commissioner, 5 Cir., 143 F.2d 712, 714; Grover C. Ligon v. Commissioner, 37 B.T.A. 763; Hans Pederson v. Com'r, 14 B.T.A. 1089, 1117, 1118.

■ The appellant argues earnestly that, since the government stipulated in the district court the transaction of July 26, 1932 was a loan, it cannot now be heard to make the contention that it was a loan in form and in substance a sale. The government, however, should not be foreclosed from asking the court to examine the actual facts to determine the exact nature of the transaction, for it states that its intention, in conceding the transaction was a loan, was merely a concession that it was such merely in form.

■ Looking at the factual situation, although the transaction was set up in the books of the appellant as a loan, the taxpayer's books are only evidential, not conclusive, of the true nature of the transaction (cf. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570; Doyle v. Mitchell Brothers Co., 247 U.S. 179, 187, 38 S.Ct. 467, 62 L.Ed. 1054; Bankers Mortg. Co. v. Commissioner, 5 Cir., 141 F.2d 357) and they, together with all the surrounding facts (W. L. Moody Cotton Co. v. Commissioner, supra), must be examined to determine whether there is an attempt to evade taxes by " 'anticipatory arrangements and contracts however skilfully devised * * *.' " Cf. Griffiths v. Commissioner, 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed 319. Questions of taxation must be determined by viewing what was actually done rather than the declared purpose of the participants. Weiss v. Stearn, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520.

The government concedes that in every essential form the transaction of July 26, 1932 was a loan. All the instruments executed plainly reflected that the transaction was a loan. The records of the appellant and the Old Bank evidenced the intention of the parties to establish a debtor-creditor relation with the stocks pledged as collateral. There was not any evidence whatsoever that the parties to the transaction— the directors of the Old Bank, the trustees of the appellant, and the executive committee of the New Bank—treated the transaction other than as a loan. The conduct of the appellant in setting up the transaction on its books, in crediting dividends received on the collateral stock as interest income, in reporting such amounts as interest income on its tax returns, and in not sending proxies on the stock, reflected what was in the minds of the appellant's trustees with respect to the transaction. Another fact indicating the lack of ownership by appellant is that it was not the policy of the appellant-trust to invest in other than bank stocks. None of the collateral was of that nature. As far as form went all the incidents of a loan were present in the 1932 transaction, and the appellant at no time evidenced any intention of buying the collateral.

The government, however, contends that with all this the transaction in substance was a sale, and closed on July 26, 1932. With this we are not in agreement. The fact, as the appellee argues, that the taxpayer had as one of its motives for making the loan an avoidance of assessments on its stock holdings and, another, the desire to stabilize the banking situation in Greater Boston, does not make any transaction of July 26, 1932 any less a loan.

The government, in support of its position, contends that the taxpayer "to all intents and purposes held title to the securities * * *." True, it had the rights of the ordinary holder of a demand note secured by collateral to sell the securities, but the right to sell did not make the appellant the owner of the collateral unless the collateral was bought by it, in this case, at public auction. Under the plan of reorganization the New Bank took over the equity in the stocks pledged under the loan of $900,000. If the sales price of the securities had exceeded the amount of the loan, it is plain the appellant would have been bound to turn over the excess to the

New Bank. The New Bank on payment of the loan had a right to acquire all the rights of ownership in the pledged securities. This circumstance is clearly incompatible with any theory of ownership and of considerable probative force in establishing the true nature of the transaction. These considerations would lead to the conclusion the taxpayer was a pledgee of the stock rather than an owner.

■ The government, citing City Nat. Bank Bldg. Co. v. Helvering, 68 App. D.C. 344, 98 F.2d 216 and Gilman v. Commissioner, 8 Cir., 53 F.2d 47, 80 A.L.R. 209, argues that the obligation on the part of the borrower to repay the sum borrowed is lacking in this case; that the Old Bank was not committed to pay any sum of money in excess of the fair market value of the securities. It is true that the Old Bank after the reorganization was unable to pay the loan but that does not mean that the note was not an enforceable legal obligation against the Old Bank. There was no release from repayment of the loan as such. Further, advances may be loans even when there is an absence of personal liability and the lender can look only to the pledged securities for repayment. I.T. 3283, 1939-1 C.B. 81; I.T. 2931, 1935, XIV-2 C.B. 56.* Repayment of the amount of the advance in the cases cited is contingent, but as the court in Island Petroleum Co. v. Commissioner, 4 Cir., 57 F.2d 992, 994, certiorari denied 287 U.S. 646, 53 S.Ct. 92, 77 L.Ed 558, in determining advances were loans where the advances were to be repaid with a portion of the net profits from the proceeds of oil operations and only in the event that the operations should prove successful, states it: "A loan is no less a loan because its repayment is made contingent." Cf. Boston Elevated Ry. Co. v. Commissioner, 1 Cir., 131 F.2d 161, 164.

- One other consideration remains with respect to this issue. The securities involved formerly had a market price of $2,089,467.-06. The Old Bank had paid $1,208,935.90. In 1932, when pledged as collateral for the $900,000 note, they had a market value of $247,683.50. This was at the low point of the depression. The belief on the part of the officers of the taxpayer and the New Bank that the securities would rise sufficiently in value to liquidate the loan was reasonable. That they thought that such would be the case is evidenced by the provision in the plan that any excess beyond the amount necessary for the payment of the loan would go to the New Bank. This is of considerable importance in justifying the conclusion that the true intent of the parties was to make a loan and that the transaction in reality was a loan.

■ We reach the conclusion that the appellant did not become the owner of the pledged securities by the note transaction of July 26, 1932, that it was a pledgee, and, consequently, it received no taxable gains in 1935 and 1936 on the sale of the securities pledged to it in 1932 by the Old Bank.

■ The remaining question to decide is whether, within the provisions of Section 23(k) of the Revenue Acts of 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts, pages 673 and 828, the taxpayer is entitled to a bad debt reduction in 1936 of $370,446.66, the difference between the face amount of the loan and the amount realized on the sale of securities pledged as collateral for the loan of $900,000 to the Old Bank. The government contends that even if the transaction of 1932 was a loan it was obvious that the debt should have been determined worthless in 1932, and, therefore, it suffered no deductible loss in 1936. We do not agree. The appellant did not deduct any part of the debt as partially worthless prior to 1936, although it may have believed it was partially worthless prior to 1936. True, when a debt is totally bad, it must be deducted in the year of ascertainment, which is the year it becomes wholly worthless, but a debt which is only partially bad may be, but need not be, charged off by the taxpayer. If no claim for partial worthlessness is made, the debt may be deducted in full, when it becomes entirely worthless. First Nat. Bank of Fort Worth v. Commissioner, 5 Cir., 140 F.2d 938, 939; Blair v. Commissioner, 2 Cir., 91 F.2d 992, 994; Mertens, Vol. 5, Sec. 30.23.

---

* The cases in which these rulings were made were cases where corn and cotton producers signed notes agreeing to pay certain amounts with interest, the commodities being pledged as security. The loan agreement provided that upon maturity the holder was authorized to sell the commodity and any excess of the sales price over the amount due on the note was payable to the producers. There was a provision that the producer (absent misrepresentation) was not personally liable for any deficiencies. It was held that the advances received by the producers should be treated as loans and not as proceeds from a sale of the corn or cotton.

It is plain here that the part of the note which was unrecovered could not have been ascertained to be uncollectible until the last of the pledged stocks had been sold in 1936, and the taxpayer is entitled to a deduction for the difference between the face value of the note and the sales price of the securities sold in 1934, 1935, and 1936, i.e., $370,446.66.

In the view reached with respect to the questions involved, it is unnecessary to consider other grounds relied on.

The judgment of the District Court is reversed and the case is remanded to that court with directions to enter judgment in accordance with this opinion; the appellant recovers costs of appeal.