### INDUSTRIAL TRUST CO. v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 4701.

United States Court of Appeals, First Circuit.

July 7, 1953.

230

Stuart H. Tucker, Providence, R. I. (Hinckley, Allen, Salisbury & Parsons, Providence, R. I., on the brief), for petitioner.

Cecelia H. Goetz, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack and Helen Goodner

Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition under 26 U.S.C. §§ 1141, 1142, for review of a decision by the Tax Court entered on June 18, 1952, determining a deficiency of $55,561.94 against the taxpayer for the year 1943, based on the disallowance of a claimed deduction of $324,698.41 for a secured debt contracted in 1929 which allegedly became totally worthless upon final liquidation of the collateral in 1943. The petitioner, Industrial Trust Company, a Rhode Island banking corporation, contends that the Tax Court erred in holding that the taxpayer became owner of the security prior to 1943. .

On January 2, 1929, the taxpayer loaned $850,000 to Dutee W. Flint Oil Co., Inc., (hereinafter referred to as Flint Co.), also a Rhode Island corporation, taking a demand note secured by the delivery of 23,-583 shares of common stock of Standard Oil Company of New York as collateral. Standard Oil Company merged and reorganized over a number of years until ultimately the original pledged stock was represented by an equal number of shares of Socony-Vacuum Oil Company, Inc. but this is not significant. The note * authorized public or private sale of the collateral upon default, without notice, and purchase by the holder of the note. This collateral had a market value of over a million dollars at the time of the loan, but during 1929 this value declined substantially. Sometime in 1930 Flint Co. ceased to do business and, upon winding up its affairs, proved to be insolvent. The taxpayer never received any payments of principal, and interest on the note was continuously in default from

---

* The note provides in part:

"* * * with authority to sell the same, or any part thereof, or any collaterals substituted for or added to the above, without notice, either at public or private sale or otherwise, at the option of the holder or holders hereof on the non-performance of this promise, the holder or holders applying the net proceeds to the payment of this note * * * and it is hereby agreed that the holder or holders of this note, or any person in his or their behalf, may purchase at any such sale discharged from any right of redemption."

October, 1929. Interest payments were credited on the note from time to time by means of the dividends paid on the pledged stock, which were delivered to the bank by Dutee W. Flint until April 6, 1932, and which, after that date, were collected through the nominee of the bank.

On April 6, 1932, with the consent of the pledgor Flint Co., the pledgee bank transferred the pledged stock to its nominee, Rowe & Co., a partnership consisting of certain employees of the bank's trust department. The bank records show that Rowe & Co. held the stock in decreasing amounts, in the name of "D. W. Flint Oil Company, Inc., loan department safekeeping account, dividends to loan department," until March 19, 1943. There was testimony that this partnership was used solely to hold securities and other properties received by the bank as fiduciary, in order to facilitate sale. A trust account was maintained for the stock and the taxpayer's trust department accounted to the taxpayer's loan department which credited interest with dividends received and turned over by Rowe & Co.

On November 20, 1933, the existence of Flint Co. was terminated under the laws of Rhode Island and by the end of that year, the pledged stock was worth less than $400,000. The taxpayer charged off, and took as a 1933 deduction for a partially worthless bad debt, the amount of $125,000 on the $850,000 loan. Subsequently, in 1934, the Federal Reserve Examiner disapproved this partial charge-off and required the taxpayer to charge off on its books the excess of the loan above the market value of the stock. The taxpayer took no deduction for this additional charge-off in its 1934 tax return.

On October 24, 1936, the bank commenced liquidation of the pledged stock, under direction of the taxpayer's president, who tried to time sales with market conditions. Proceeds from sales were credited against the loan by the loan department.

In 1940, the loan stood on the taxpayer's books at $143,756.83, which was still more than the value of the remaining collateral, so pursuant to instructions of the Federal Reserve Examiner, the bank charged off $49,256.83, deducting this amount in its 1940 tax return. On November 14, 1942, the Federal Reserve Examiner directed the bank to transfer the stock to its investment portfolio and after selling another 3,000 shares, the remaining balance of 9,000 shares was transferred on March 19, 1943, from the taxpayer's trust department to its investment portfolio. At this time, the bank credited the loan with the market value of the 9,000 shares and closed out the Flint Co. account in the trust department and the loan department.

Upon the completion of this transaction, the bank claimed as a bad debt deduction the balance on the original amount of the loan remaining after subtracting the proceeds from sales of the collateral between 1936 and 1943 and previous bad debt deductions taken in the tax returns of 1933 and 1940. These two previous deductions for partial worthlessness totalled $174,256.-83 and sales of the security realized a total of $351,044.76, leaving a balance of $324,-698.41 owed to the bank on the demand note. The Tax Court held substantially that this balance was not deductible in 1943 because the conduct of the taxpayer bank, despite complete records to the contrary, showed a dominion over the collateral which was more consistent with ownership than with a debtor-creditor relationship prior to 1943.

The taxpayer contends that this was erroneous, in view of our holding in a somewhat similar situation, in Old Colony Trust Associates v. Hassett, 1 Cir., 1945, 150 F.2d 179. In that case on July 26, 1932, the taxpayer bank loaned a large sum of money to a practically insolvent Boston bank, taking a demand note secured by collateral which had a market value substantially less than the amount of the loan. The taxpayer carried the collateral on its books as pledgee and shortly after the loan was made, the debtor bank ceased to do business and transferred all of its assets, including its right of redemption on the pledged stock, to a new bank which was organized to take over its business. This new bank assumed all the obligations of the debtor bank except the note. Therefore in 1934 the tax-

payer bank commenced to sell the pledged stock. When the last sale of the stock was made in 1936, the taxpayer claimed a bad debt deduction, which the Commissioner disallowed. The district court upheld the Commissioner. We reversed, holding that the transaction was a loan, not a sale, as the Commissioner contended, and therefore that the bad debt deduction on the secured loan was properly taken on the final sale of the security.

■ In the Old Colony case, the disputed legal effect of the transaction rested primarily on the conduct of the parties at the inception of their dealings with each other, but here we are concerned with the conduct of an acknowledged creditor which the Tax Court held to have become owner of its collateral in less than the fourteen years that it was reflected on the books as collateral. As was pointed out in Old Colony, supra, 150 F.2d at page 182, bank records are only evidential, so although the taxpayer's records in this case clearly indicate that it did not foreclose the security or become owner prior to 1943, that is not conclusive. If other circumstances contradict the bank records, the finding of the Tax Court may be affirmed.

The contradictory circumstances relied upon by the Tax Court are: (1) the simple means of foreclosure, or, in the words of the Tax Court, "The taxpayer creditor could acquire ownership of the pledged property with a minimum of formality," (2) the taxpayer's failure to identify anyone as holder of the right of redemption; (3) the treatment of dividends and proceeds from sale of the security, viz., direct payment of the dividends to the taxpayer's nominee to which the stock was transferred in 1934 and the failure to secure permission for receipt of the dividends or sale of the security, or to render an accounting, which was customary fiduciary procedure for the taxpayer.

■■ The first point mentioned by the Tax Court is no support for an inference that the taxpayer was the owner of the pledged stock prior to 1943. In effect, the opinion of the Tax Court equates power to foreclose with an act of foreclosure, which

is clearly erroneous. The degree of formality required by the terms of a pledge in order to foreclose it, does not affect the continuing existence of the pledge after default. Liberal foreclosure powers do not make default synonymous with foreclosure. Some act of foreclosure by the pledgee is necessary, usually a sale, in order to acquire title to the pledge. Thomas v. Waters, 1944, 350 Pa. 214, 38 A.2d 237; Jones v. Costlow, 1944, 349 Pa. 136, 36 A.2d 460; Moss Industries v. Irving Metal Co., 1948, 142 N.J.Eq. 704, 61 A.2d 159; Jennings v. Wyzanski, 1905, 188 Mass. 285, 74 N.E. 347. We are not aware of any section of the Internal Revenue Code or any Regulation that indicates otherwise. In the absence of any reason to the contrary, we prefer a certain and uniform tax rule making ownership and its incidents dependent on an act of foreclosure by the pledgee rather than a tax rule subject to the uncertainties and confusion of making ownership of a pledge dependent upon the "degree of formality" provided for its foreclosure.

■ With regard to the fact that there was no known holder of the right of redemption on the Flint Co. note in this case, it is urged by the government that this sufficiently distinguishes the Old Colony case to justify a different result. When Flint Co. went out of existence in 1933, under the governing Rhode Island law the right of redemption passed to its stockholders, subject to the claims of the corporate creditors. DiPrete v. Vallone, 1946, 72 R.I. 137, 48 A.2d 250. Since the right of redemption remained outstanding under the applicable law, the justification for the Tax Court's finding that the pledgee became the owner prior to 1943 must derive from the taxpayer's failure to show who held the right or from the slight likelihood that anyone would ever exercise the right. Neither of these reasons is an adequate justification. Surely the existence of a right is not negatived by the fact that its holder is unknown. And once a taxpayer has shown a defeasible title, it is not incumbent upon him to show who holds the power of defeasance. Accord Marcus Boyd, 1945, 14 T.C.M. 303; Spencer v. Commissioner, 1930, 21 B.T.A. 859. As to the slight

chance that the right of redemption would ever be exercised, that is true in every case involving a bad debt, so if the reasoning of the Tax Court is correct, almost every secured bad debt would have to be liquidated and deducted immediately after default, contrary to the clear intent of the law, which allows deductions for both partially worthless bad debts and totally worthless bad debts, with final sale of the security fixing the time for the total loss. 26 U.S. C. § 23(k) (1946); U.S.Treas.Reg. 111, § 29.23(k)–1, 3, 26 CFR § 29.23(k)–1, 3; Old Colony Trust Associates v. Hassett, supra.

■ The only remaining support for the finding of the Tax Court is the conduct of the petitioner taxpayer during the fourteen years that the Flint Co. loan was carried on its books. The event most indicative of ownership was the transfer of the collateral to the taxpayer's nominee, Rowe & Co., in 1932. However, there is uncontradicted evidence that the pledgor consented to this transfer and that this was a customary practice of the taxpayer designed to facilitate disposition of pledged property in the event of the pledgor's death. Under such circumstances, the transfer alone cannot be held to alter the bank's position as pledgee, especially in view of the bank records. Even where the pledgor's consent was not obtained, such a transfer has been held to be consistent with a continuance of the pledge. Moore v. Waterbury Tool Co., 1938, 124 Conn. 201, 199 A. 97, 116 A.L.R. 564; Manufacturers Trust Co. v. Chris. Schroeder & Son, 1937, 224 Wis. 580, 271 N.W. 915, rehearing denied 273 N.W. 231. See Jones v. Costlow, supra. The record before us does not support the inference that the petitioner's transfer to Rowe & Co. in 1932 was an act inconsistent with the pledge.

■ The other conduct of the petitioner referred to in the Tax Court opinion seems to us to be equally consonant with the reasonable and prudent behavior of an institutional pledgee. We think it is erroneous to say that the petitioner treated the dividends received on the pledged stock as its own property. Rowe & Co. simply turned over all the dividends to the loan department to be applied in payment of the defaulted interest. It seems even more erroneous to draw an inference of ownership from the fact that the dividends were so applied and the security was gradually disposed of without obtaining permission from anyone and without rendering an accounting to anyone. The petitioner proceeded strictly in accordance with the terms of the note, which specifically dispenses with the requirement of any notice. No more than this should be demanded of the petitioner, especially when the duties of notice and accounting sought to be imposed here seem to involve a rather difficult search. Furthermore, the petitioner's practice of rendering annual accountings on all fiduciary accounts is not pertinent to the treatment of a bad debt because bad debts are obviously not sufficiently frequent or in the ordinary course of business, where customary practice should be expected or could be determined. The record does not disclose any departure from customary practice and even if it did, the unusual nature of the situation in this case might well warrant such a departure.

Thus we think there is no basis for the Tax Court's finding that the petitioner became owner of the collateral on the Flint Co. loan prior to 1943. The records of the petitioner are complete, unambiguous and entirely consistent with its asserted position of pledgee. We perceive no circumstances which would justify an inference contrary to the clear import of these records.

■ It is urged by the Commissioner that even though the Tax Court is clearly erroneous in its finding of fact, still the decision may be affirmed on the alternative ground that as a matter of law the taxpayer cannot split between two taxable years its right to deduct as a bad debt the amount by which the loan exceeded the value of the securities pledged for its payment. We do not agree with this contention.

The taxpayer was fully within its rights in taking deductions in 1933 and 1940 for a partially worthless bad debt based on the

excess of the debt over the fair market value of the collateral and then in 1943, upon final sale of the collateral, taking a third deduction for a totally worthless bad debt. This is not an instance of splitting a deduction; it is an instance of taking two different deductions, for different types of loss, both deductions being clearly authorized.

 .The Commissioner says that the taxpayer knew that the debt was entirely worthless when the Flint Co. went out of existence in 1933. Yet it is undisputed that the right of redemption remained outstanding and that a total loss on a secured debt, when the debtor is insolvent, is sustained for tax purposes when the security is wholly liquidated. Fletcher v. Commissioner, 1930, 20 B.T.A. 1234; Kessler Oil & Gas Co. v. Commissioner, 1940, 41 B.T.A. 31; Marcus Boyd, supra; Old Colony Trust Associates v. Hassett, supra. Respondent urges that since a totally worthless bad debt must be fully deducted in the year that worthlessness is established, then we should hold that a partially worthless bad debt must be deducted to the full extent of the difference between the loan and the market value of the collateral. As stated by petitioner, "the contention of the respondent is merely that the amount which was claimed as a bad debt deduction by the petitioner in 1943 should have been taken as a deduction in 1933, and, notwithstanding that it was not so taken in 1933, the deduction is not allowable in 1943."

This is contrary to the code, to the regulations, and to the nature of a partial loss. The respondent even admits that "clearly in such cases considerable latitude and discretion must be accorded the taxpayer in determining the amount of the debt which has become uncollectible during any year." Since this is so, in view of market fluctuations, we cannot say that the precise amount of the partial worthlessness on this bad debt was clearly ascertainable in 1933, or that it was unreasonable for the taxpayer to think in 1933 that there might be a considerable rise in the market value of the pledged stock which would reduce the amount of the bad debt loss. .

With the exception of a 1942 amendment which was discarded in favor of the original wording in a 1943 retroactive amendment, the statute relating to partial bad debt deductions applicable to the years from 1933 to date, provides in part:_ "* * * and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *" 26 U.S.C. § 23(k) (1946). The pertinent regulation provides in part: "* * * Before a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the Commissioner the amount thereof which is uncollectible and the part thereof which was charged off. If a debt becomes wholly worthless during the taxable year, the amount thereof which has not been allowed as a deduction for any prior taxable year shall be allowed as a deduction for the taxable year. * * *" U.S.Treas.Reg. 111, § 29.23(k)–1(b). This language is clear enough to dispose of the respondent's contention that a greater partial bad debt deduction should have been taken in 1933. The petitioner deducted the amount charged off; it could not deduct any more.

The petitioner was entitled to postpone any deduction for partial worthlessness until final liquidation when it deducted total worthlessness and the charge-off required by the Federal Reserve Examiner in 1934 did not affect the petitioner's right to treat its loss in this manner. See U.S.Treas. Reg. 111, § 29.23(k)–1(c); First Nat. Bank of Fort Worth v. Com'r of Int. Revenue, 5 Cir., 1944, 140 F.2d 938. We perceive no reason for disallowance of the deduction for total worthlessness in this case.

The decision of the Tax Court is reversed and the case is remanded to that court for further proceedings in accordance with this opinion.