TEMPLE N. JOYCE AND LOUISA D. JOYCE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93342. Filed June 23, 1964.

*George E. McMurray, Jr.*, for petitioners.
*George K. Dunham*, for respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1958 and 1959 in the respective amounts of $12,100.21 and $46,012.20.

One of the issues raised by the pleadings having been settled by the parties, the remaining principal issues are (1) whether gains on sales of Unexcelled Chemical Corp. stock in 1959 were properly reported in the gross income of Farmingdale Manufacturing Corp., a corporation wholly owned by petitioner (rather than in his own gross in-

come), thereby terminating the corporation's election not to be subject to the taxes imposed by chapter 1 of the Internal Revenue Code of 1954 and thereby depriving the petitioners of the right under section 1374 of the Code to deduct the corporation's net operating loss for 1959; and (2) if such gains are taxable to the corporation, whether gains on sales of stock of Dynamic Electronics New York, Inc., in 1959 were properly reported by the petitioner in his gross income (rather than in the corporation's gross income). Dependent upon the decision of issue (1) above is the issue of whether petitioner is entitled to a net operating loss carryback from the year 1959 to the year 1958. Other issues remaining are (1) whether gains on sales of other Dynamic Electronics stock by the petitioner were properly reported by him in his gross income for the taxable year 1959 (rather than for the taxable year 1958), and (2) dependent on the decision of this issue, the amount of the medical expense deduction to which the petitioners are entitled for the taxable year 1958.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners are individuals, husband and wife, residing in Anne Arundel County, Md. They timely filed joint income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue at Baltimore, Md. They reported their income on the cash receipts and disbursements method of accounting. Hereinafter Temple N. Joyce will be referred to as the petitioner.

In December 1958 the petitioner had 34,853 shares of stock of Dynamic Electronics New York, Inc. (hereinafter referred to as Dynamic), in a brokerage account with W. W. Schroeder & Co., Inc. (sometimes hereinafter referred to as Schroeder). On various dates in December 1958 the petitioner sold through Schroeder 6,500 of such shares. The petitioner then instructed a representative of Schroeder not to sell any more of his shares of Dynamic stock until after the end of the year 1958. Nevertheless, thereafter in December 1958 there were effected through the facilities of the brokerage firm of Laidlaw & Co. (hereinafter referred to as Laidlaw), sales of additional shares of the Dynamic stock for petitioner's account. Laidlaw's confirmations of such sales showed that 2,500 shares were traded on December 22, 1958, with settlement date of December 30, 1958, and that 500 shares were traded on December 24, 1958, with settlement date of January 2, 1959. Such confirmations which were first mailed by Laidlaw to Schroeder were not received by the petitioner until after January 1, 1959. Laidlaw's statement of the petitioner's account with it as of December 31, 1958, reflected a credit to the petitioner of $19,548.75 representing the net proceeds of sales of 2,500

shares of Dynamic stock and also showed that the account was short 2,500 shares of Dynamic stock. For several weeks the petitioner and a representative of Schroeder were in controversy with respect to the December 1958 sales of the 2,500 shares of Dynamic stock, but sometime in January 1959 petitioner accepted the transactions. Laidlaw's statement of the petitioner's account as of January 31, 1959, showed the receipt on January 23, of 28,453 shares of Dynamic stock. It also showed that on January 26, 1959, Laidlaw issued its check in the amount of $53,197.71, which included the net proceeds from the December 1958 sales of the 2,500 shares of Dynamic stock.

During the year 1959 the petitioner owned all of the 1,250 shares of outstanding capital stock of Farmingdale Manufacturing Corp. (hereinafter referred to as Farmingdale), a Maryland corporation, which stock had cost him $1,250. He was its president and directed its business.

During such year Farmingdale was engaged in the business of research and development, principally in attempting to develop an invention having to do with the improvement of looms. In December 1958, the petitioner hoped that Farmingdale would complete this invention by the end of 1959 and then license the rights thereto to a manufacturer on a royalty basis, with the first royalties to be received several years thereafter.

In December 1958 the petitioner took certain steps for the purpose of obtaining capital for Farmingdale to enable it to continue its development work. On February 26, 1959, Franklin National Bank, Franklin Square, N.Y. (sometimes hereinafter referred to as the bank), loaned Farmingdale $100,000, evidenced by a note due May 26, 1959. On February 17, 1959, the petitioner had executed in favor of the bank an instrument entitled "Guarantee Of All Liability With Collateral," in which he guaranteed the bank the prompt and unconditional payment of any and every obligation or liability of Farmingdale to the bank. It was therein recited that the petitioner had deposited with the bank 20,000 shares of Dynamic stock and 1,000 shares of stock of J. I. Case Co. as collateral security for his liability as guarantor. All these shares of stock were owned by petitioner immediately prior to their deposit by him with the bank. The petitioner and the bank had an oral understanding that from time to time the petitioner would instruct his broker to sell as many of the pledged shares as he felt the market could absorb without an adverse effect, to inform the bank of each sale, and to deliver the proceeds of the sale to the bank, which would then release the appropriate number of pledged shares and apply the proceeds to payment of the loan. It was then petitioner's intention that any proceeds from sales of the pledged shares of stock in excess of the amount necessary to repay the bank for the loans would be used as additional working capital for Farm-

ingdale. After February 26, 1959, further short-term loans were made to Farmingdale by the bank and from time to time these loans were renewed and payments were made thereon.

Commencing May 26, 1958, and continuing through June 10, 1959, 12,000 shares of Dynamic stock, including 9,900 pledged shares and 2,100 other shares, were sold through petitioner's Laidlaw account. The bank released 11,000 of the pledged shares to Laidlaw upon payment to it of the proceeds of the sales in the amount of $100,452.80. The bank applied $82,853.76 of the sales proceeds to the loans and interest due thereon and paid the remainder of such proceeds, namely, $17,599.04 representing proceeds of the sales of the 2,100 unpledged shares, to the petitioner. Pursuant to the petitioner's instructions 1,000 shares of the released Dynamic stock were returned by Laidlaw to the bank.

From July 20 through November 19, 1959, there were sold through the petitioner's Laidlaw account 10,100 shares of pledged Dynamic stock, and the bank released such shares and applied the proceeds of the sales in the amount of $40,080.99 against the loans.

After each sale of pledged Dynamic stock a note in the amount of the net sales proceeds was given by Farmingdale to the petitioner. None of the pledged Dynamic stock nor the proceeds of the sales thereof passed through the petitioner's hands.

On April 29, 1959, there were purchased through the petitioner's Laidlaw account on margin 2,000 shares of stock of the Unexcelled Chemical Corp. (hereinafter referred to as Unexcelled). The stock was purchased for Farmingdale with the expectation of later selling it at a profit to provide more funds for Farmingdale's development work. The stock was purchased through petitioner's Laidlaw account, rather than in Farmingdale's name, because Farmingdale did not at that time have a stock brokerage account. On May 7, 1959, the bank loaned Farmingdale $20,000, which was to be used in partial payment for the Unexcelled shares,[1] and such amount was credited to petitioner's Laidlaw account on May 8, 1959. As of May 15, 1959, an account was opened by Laidlaw in the name of Farmingdale and the 2,000 shares of Unexcelled stock and $26,000 (consisting of the $20,000 borrowed from the bank and $6,000 representing funds from Farmingdale's checking account) were transferred to this account.[2]

In June and July 1959, the 1,000 shares of pledged J. I. Case Co. stock were delivered by the bank to Laidlaw. These shares were sold and the proceeds were reinvested in 1,000 shares of Rudy Manufacturing Co.

---

[1] There was an agreement with the bank at the time of the loan of the $20,000 that the Unexcelled shares would be deposited with the bank as collateral security for such loan.

[2] Such shares were reflected in the statements of Farmingdale's Laidlaw account. They were not reflected in the statements of petitioner's Laidlaw account.

On July 2, 1959, the petitioner purchased 500 shares of Unexcelled stock through his Laidlaw account.

The petitioner on July 15, 1959, executed another guarantee agreement in favor of the bank, which contained the same terms and provisions as that of February 17, 1959. As recited in such agreement there were deposited with the bank as collateral security 2,500 shares of Unexcelled stock (consisting of the 2,000 shares purchased for Farmingdale on April 29, 1959, and the 500 shares purchased by the petitioner on July 2, 1959) and the 1,000 shares of stock of Rudy Manufacturing Co.

On September 18, 1959, there were sold through Farmingdale's Laidlaw account 500 shares of Unexcelled stock, which shares were a part of the 2,000 shares placed in Farmingdale's Laidlaw account in May 1949. The shares were released to Laidlaw by the bank against payment of the proceeds of the sale in the amount of $7,619.26, which amount was deposited in the account of Farmingdale at the bank.

In October 1959 the 1,000 shares of Rudy Manufacturing Co. stock were sold through the petitioner's Laidlaw account, and the proceeds of the sales in the amount of $10,778.23 were deposited in the checking account of Farmingdale at the bank.[3] Notes were given by Farmingdale to petitioner as in the case of the proceeds of sales of Dynamic stock.

On November 18, 1959, 500 shares of Unexcelled stock were sold through Farmingdale's Laidlaw account, such shares being a part of the 2,000 shares placed in Farmingdale's account at Laidlaw in May 1959. The bank released the 500 shares against payment to it by Laidlaw of the proceeds of the sale in the amount of $8,979.95 and applied that amount on Farmingdale's loan account.

The balance of the amount owed by Farmingdale to the bank, $33,085.30, was paid off in January 1960 by the sale of the remaining collateral security in the same manner as hereinbefore described for the earlier sales.

In their joint income tax return for the year 1958 the petitioners reported adjusted gross income of $39,921.27 and taxable income of $34,030.25. Therein the petitioner did not report any amount on account of the 2,500 shares of Dynamic stock traded through his Laidlaw account in December 1958. In such return the petitioners claimed a deduction for medical and dental expenses in the amount of $986.61, based upon their combined adjusted gross income.

---

[3] Such receipts were recorded in Farmingdale's cash receipts journal for 1959 as follows:
"Oct. 1. Laidlaw & Co.—T. Joyce—500 shares Rudy Mfg. Stock Acct. T. Joyce $4,494.28;
Oct. 13 Laidlaw & Co.—T. Joyce—300 shares Rudy Mfg.—Acct. T. Joyce—$3,170.39; and
Oct. 16—Franklin National Bank—Personal Loan T. N. Joyce, 200 shares Rudy stock—$2,113.56."

On January 29, 1959, Farmingdale made and executed an election on Treasury Department Form 2553, under section 1372(a) of the Internal Revenue Code of 1954, not to be subject to the taxes imposed by chapter 1 of the Code. Such election, together with a consent to the election by the petitioner as the corporation's sole stockholder, was duly filed with the district director of internal revenue at Baltimore on January 30, 1959.

Farmingdale timely filed its income tax return for the calendar year 1959 on Form 1120-S, U.S. Small Business Corporation Return of Income, showing a net loss of $211,270.86. Therein it reported total income of $2,097.31, consisting of net long-term capital gain of $1,947.31 on the sales of 1,000 shares of Unexcelled stock, and other income in the amount of $150. In the yearend balance sheet attached to such return Farmingdale reflected total assets of $24,360.45, including the remaining 1,000 shares of Unexcelled stock in the amount of $14,651.90; total liabilities of $325,987.79 which included long-term bonds, notes, and mortgages payable to shareholders in the amount of $163,712.98; capital stock of $1,250; and an accumulated deficit of $302,877.34.

In their joint income tax return for the year 1959 the petitioners reported adjusted gross income of $4,971.63 but no taxable income. Therein they included among capital gains and losses on sales of unpledged Dynamic stock, gain on the sale of the 3,000 shares traded by Laidlaw for petitioner's account in December 1958. Therein they also included net long-term capital gain of $122,934.75 on sales of the 20,000 shares of pledged Dynamic stock from June 1959 through November 1959; net short-term capital loss of $1,701.46 on sales of 1,000 shares of pledged J. I. Case Co. stock in June 1959; net short-term capital loss of $2,483.91 on sales of 1,000 shares of pledged Rudy Manufacturing Co. stock in October 1959; and net long-term capital gain of $3,919.57 on the sale of 500 shares of pledged Unexcelled stock in December 1959. In such return the petitioner showed the amount of $163,712.98 as the deductible portion of the net operating loss of Farmingdale for its taxable year 1959 but claimed as a deduction only $112,136.97 thereof, which was sufficient to result in no tax liability.

In the notice of deficiency the respondent determined that the 3,000 shares of Dynamic stock traded for petitioner's account in December 1958 were sold in December 1958 and that the net gain of $23,829.85 thereon was properly includable as long-term capital gain for the taxable year 1958, rather than for the year 1959. This resulted in an increase in the petitioner's adjusted gross income, as a consequence of which the respondent disallowed $657.45 of the claimed deduction for medical and dental expenses.

In the notice of deficiency the respondent also determined that the gross receipts reported by Farmingdale for the taxable year 1959 con-

stituted personal holding company income within the provisions of section 1372(e)(5) of the Internal Revenue Code of 1954 and held that Farmingdale's election not to be subject to the taxes imposed by chapter 1 of the 1954 Code was therefore terminated for the year 1959. He accordingly disallowed the deduction of $112,136.97 claimed by petitioner on account of Farmingdale's net operating loss for 1959.

OPINION

In his return for the taxable year 1959 the petitioner reported the gains on the sales of Dynamic stock which he had pledged with the bank to secure his guarantee of repayment of the loans made by the bank to Farmingdale, and against his reported income he claimed as a deduction, under section 1374 of the Internal Revenue Code of 1954,[4] $112,136.97 of the 1959 net operating loss of Farmingdale, which, pursuant to section 1372(a) of the Code,[5] had elected not to be subject to the taxes imposed by chapter 1 of the Code. Farmingdale included in its return for 1959 gains on sales of Unexcelled stock. The respondent determined that such gains constituted personal holding company income, that they constituted more than 20 percent of its gross receipts, and that therefore Farmingdale's election terminated in 1959, pursuant to section 1372(e)(5) of the Code,[6] with the

---

[4] Sec. 1374 provides in pertinent part as follows:

(a) GENERAL RULE.—A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

(b) ALLOWANCE OF DEDUCTION.—Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)).

(c) DETERMINATION OF SHAREHOLDER'S PORTION.—

\*  \*  \*  \*  \*  \*  \*

(2) LIMITATION.—A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—

(A) the adjusted basis \* \* \* of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation \* \* \* and

(B) the adjusted basis \* \* \* of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation \* \* \*

[5] Sec. 1372(a) provides as follows:

(a) ELIGIBILITY.—Except as provided in subsection (f), any small business corporation may elect, in accordance with the provisions of this section, not to be subject to the taxes imposed by this chapter. Such election shall be valid only if all persons who are shareholders in such corporation—

(1) on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, or

(2) on the day on which the election is made, if the election is made after such first day,

consent to such election.

[6] Sec. 1372(e)(5) provides as follows:

PERSONAL HOLDING COMPANY INCOME.—An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which it derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of

. result that the petitioner was not entitled to a deduction of any part of Farmingdale's net operating loss for 1959.

In his original petition the petitioner contended, in effect, that Farmingdale was in error in including in its return the gain from the sale of Unexcelled stock, that the gain was in reality that of the petitioner, that the respondent erred in failing to recognize this, that therefore Farmingdale's election was not terminated, and that petitioner is entitled to a deduction on account of Farmingdale's net operating loss. Later, in an amendment to his petition, the petitioner alternatively alleged that he was in error in including in his return the gain on the sale of shares of Dynamic stock pledged with the bank, that such gain in reality was that of Farmingdale, and that the respondent erred in failing to recognize this. The petitioner thus contends that either Farmingdale is taxable upon the gains from sales of all the stock, including the pledged stock, and hence such gains in this manner will be offset by losses sustained by Farmingdale, or he is taxable upon the gains from all such sales and is entitled to offset such gains by the net operating loss of Farmingdale.

On brief the petitioner's principal contention is the alternative alleged in the amendment to the petition, although he does not abandon the original contention made in his petition.

The respondent, on the other hand, contends that the gains on the sales of the Unexcelled stock were properly reported as taxable to Farmingdale, that the gains on the sales of the pledged Dynamic stock were properly reported as taxable to the petitioner, and that the determinations made in the notice of deficiency are correct.

We will first consider the Dynamic stock. The petitioner's principal contention is that the substance of the transaction by which he pledged his Dynamic stock with the bank was a contribution by him of such stock to the capital of Farmingdale, or that a contribution thereof was made no later than the moment such stock was ordered to be sold, and that therefore the proceeds from the sales of such stock are properly taxable to Farmingdale. He argues that all the transactions involving the Dynamic and Unexcelled stocks must be viewed as a whole; that such transactions were all part of one plan to provide working capital for Farmingdale to enable it to engage in research and development; that since Farmingdale had insufficient funds and no prospect of earnings for a considerable time the loans made by the bank could only be repaid from proceeds of sales of the pledged stock; that he had an oral understanding with the bank that the stock would be sold as the market permitted and that the proceeds would be applied

stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

for the repayment of the loans; that it was his intention that any excess of the amount necessary to repay the loans would be used for additional working capital for Farmingdale; and that he had thus put the pledged stock beyond his personal control.

At the outset it must be recognized that tax liabilities are to be determined in the light of what in fact was done. *Weiss* v. *Stearn,* 265 U.S. 242; *United States* v. *Phellis,* 257 U.S. 156; and *Old Colony Trust Associates* v. *Hassett,* (C.A. 1) 150 F. 2d 179. See also *Remington Rand, Inc.* v. *Commissioner,* (C.A. 2) 33 F. 2d 77. The parties' expectations or hopes as to tax treatment of their conduct in themselves have nothing to do with the matter. *Commissioner* v. *Duberstein,* 363 U.S. 278.

It is clear that under the guarantee agreement which the petitioner executed in favor of the bank ownership of the stock which the petitioner deposited was not transferred either to the bank or to Farmingdale but was merely pledged as collateral security for the petitioner's obligation as guarantor of the loans which the bank made to Farmingdale. The fact that under such agreement the bank had the right to sell such pledged stock under certain circumstances in order to collect the amount due it does not affect the ownership of the stock prior to the time of a sale thereof. Until such a sale occurred the property remained that of the petitioner as pledgor. See *Hans Pederson,* 14 B.T.A. 1089; *Old Colony Trust Associates* v. *Hassett, supra;* and *Grover C. Ligon,* 37 B.T.A. 763. Prior to any such sale the petitioner could have paid any liability as guarantor which might arise and obviate the sale of any of the pledged stock. Furthermore, if any of the stock should be sold under the guarantee agreement for an amount in excess of the petitioner's liability as guarantor, the excess would legally belong to him. While the petitioner testified that it was his intention that the bank loans would be repaid from proceeds of sales of the pledged stock, and while he had an oral understanding with the bank that from time to time he would instruct his broker to make sales, the fact remains that until such sales were made he remained the owner of the stock. We cannot agree with the petitioner's contention that he had lost all control over the stock. We also think it of significance that the pledged Dynamic stock was sold through petitioner's Laidlaw account and that such sales were reflected in petitioner's monthly statements from that company. Also of significance is the fact that both the petitioner and Farmingdale considered that the stock continued to belong to the petitioner until the sales thereof. Following the sales of the Dynamic stock Farmingdale executed notes in favor of the petitioner in the amount of the net proceeds of such sales. Petitioner, and not Farmingdale, reported the gains from the sales as taxable income. Consistently, the peti-

tioner in his return claimed losses on the sales of the J. I. Case Co. and the Rudy Manufacturing Co. stocks which were pledged, and reported the gain on the sale of the 500 shares of Unexcelled stock which he had pledged.

Under the circumstances it must be concluded that it was the proceeds of the sales of the pledged stock which the petitioner paid to or on behalf of Farmingdale. It is unnecessary to decide whether such payments constituted contributions to Farmingdale's capital or loans to it.

We hold that the petitioner properly included in his return for the year 1959 the gains from the sales of the pledged Dynamic stock. See *Hans Pederson, supra*, and *Old Colony Trust Associates* v. *Hassett, supra*. See also *Burns* v. *United States*, (S.D. Cal.) 61 F. Supp. 312.

We also think that the gain of $1,947.31 upon the sales in September and November 1959, of 1,000 shares of Unexcelled stock constituted income of Farmingdale as reported by it. Such shares were a part of 2,000 shares of Unexcelled stock which had been purchased with funds loaned to Farmingdale by the bank and from funds in Farmingdale's checking account. While it is true that the stock was purchased through the petitioner's brokerage account and in his name, the petitioner testified, in effect, that this was done for convenience pending the opening of a brokerage account by Farmingdale and that the purchase was made on behalf of Farmingdale. The stock was duly transferred to an account opened with Laidlaw in the name of Farmingdale and the stock was carried by the broker as belonging to Farmingdale rather than to the petitioner. The 1,000 shares were sold through Farmingdale's Laidlaw account and the sales were reflected in the monthly statements of Farmingdale's account with Laidlaw. Farmingdale in its return reported the profit as belonging to it and also showed the remaining 1,000 shares of Unexcelled stock among its assets at December 31, 1959.

Since the gain on the sale of the 1,000 shares of Unexcelled stock constituted personal holding company income and amounted to more than 20 percent of the total gross receipts of Farmingdale, the respondent properly held that Farmingdale's election not to be subject to the taxes imposed by chapter 1 of the Code was terminated by reason of the provisions of section 1372(e)(5) of the Code.

The petitioner complains that the entire deficiency of about $46,000 for 1959 is generated by the fact that Farmingdale had a securities profit of $1,947.31, which is relatively small as compared to Farmingdale's operating expenses for the year, thereby depriving him of the right to deduct Farmingdale's net operating loss. He states, in effect, that the transactions which brought about this result took the

form which they did as a matter of convenience and without appreciation of the tax consequences thereof. He suggests on brief that this would be an appropriate situation for the application of a *de minimis* rule. From the petitioner's standpoint it is unfortunate that the transactions were not carried out in a manner which would accomplish the beneficial tax consequences sought by him, but under the circumstances we cannot grant the petitioner any relief. The statute unequivocally provides that if, as is true here, more than 20 percent of the corporation's gross receipts is derived from the specified sources, which includes gains on sales or exchanges of stock or securities, the corporation's election not to be subject to the taxes imposed by chapter 1 of the Code shall terminate.

The other issue for decision concerns the year in which the petitioner is taxable on the sales of certain unpledged stock of Dynamic. The respondent on brief concedes that he was in error in determining that the profit on the sale of 500 shares of Dynamic stock traded on December 24, 1958, but having a settlement date of January 2, 1959, is includable in the petitioner's gross income for 1958. Accordingly, such profit will be included in the petitioner's income for 1959, as reported by him. The respondent, however, contends that the gain on the sales of 2,500 shares of such stock traded on December 22, 1958, with settlement date of December 30, 1958, constituted income of the petitioner for 1958, rather than for 1959 as reported by the petitioner.

Section 451(a) of the Internal Revenue Code of 1954 provides that the amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Both parties agree that in the case of a taxpayer, such as the petitioner, who reports his income on the cash receipts and disbursements method, gain on the sale of stock does not constitute income until actually or constructively received by him, citing *Harden F. Taylor*, 43 B.T.A. 563, affirmed on another issue (C.A. 2) 128 F. 2d 885, and I.T. 3415, 1941–1 C.B. 240. See also sec. 1.451–1(a), Income Tax Regs.

The petitioner contends that the profit on the sales of the 2,500 shares of Dynamic stock is not includable in income for 1958, but in 1959 as reported. It is his contention that since the sales of the 2,500 shares were consummated contrary to his specific instructions to a representative of the Schroeder brokerage firm, such sales remained, for income tax purposes, incomplete transactions while he was arguing about such sales and until he finally accepted them in late January 1959. He points out that although on December 30, 1958, his Laidlaw brokerage account was credited with the net proceeds of the sales, the statement of such account showed that the account was short 2,500

shares of the stock on that date.[7] He states that under these circumstances Laidlaw would not have made the proceeds available to him until delivery to it of 2,500 shares of Dynamic stock. He concludes, therefore, that it cannot be considered that there was constructive receipt by him in 1958 of the proceeds of the sales, since it was not until late January 1959 that delivery of the shares was made to Laidlaw, pursuant to his decision to accept the transactions.

The respondent contends that the sales of the 2,500 shares were completed in December 1958, since it was then that the shares were traded and the settlement occurred. He points out that the proceeds of the sales were apparently received by Laidlaw from the purchaser on the settlement date, since the petitioner's account was credited with the net proceeds on that date. He takes the position that the fact that the Dynamic stock was not delivered to Laidlaw until late January 1959 is not decisive, since the delivery of such shares was a mere formality.

It seems apparent from the evidence presented that the petitioner had given orders to sell Dynamic stock. It is not clear whether petitioner had given such orders directly to Laidlaw, with which it had an account, or had given the orders through a representative of Schroeder, but in either event it seems clear that Laidlaw, in selling the 2,500 shares of Dynamic stock for petitioner's account, purported to act as petitioner's authorized agent. These particular sales were effected despite the petioner's instructions, given to a representative of Schroeder, to not sell any more of the stock in December. Apparently through some error such representative failed to advise Laidlaw of petitioner's instructions. Nevertheless, although the petitioner engaged in some controversy with Schroeder's representative with respect to these sales, he did not repudiate the action of Laidlaw in making the sales. Rather, he accepted the sales in late January of 1959 causing the requisite number of shares of Dynamic stock to be transferred over to Laidlaw. If the sales by Laidlaw should properly be considered as unauthorized, which we cannot conclude with certainty upon the evidence, the fact remains that the petitioner ratified the action taken by Laidlaw, including the receipt of the proceeds of the sales and the crediting of the petitioner's account with such proceeds in December 1958. Under the circumstances, we think it should be considered that the proceeds of the sales were received by the petitioner in 1958, under the principle that receipt by an agent is receipt by the principal. See *Maryland Casualty Co.* v. *United States*, 251 U.S. 342, and *Huntington National Bank*, 32 B.T.A. 342, affd. (C.A. 6) 90 F. 2d 876. We accordingly approve the respondent's

---

[7] It should be pointed out that these sales were not intended to be, and were not, short sales, and neither party contends that they were. See *Huntington National Bank*, 32 B.T.A. 342, citing *Provost* v. *United States*, 293 U.S. 443; and *O. B. Ferree*, 32 B.T.A. 725, affd. (C.A. 3) 84 F. 2d 124.

action in including in petitioner's income for 1958 the profits on the sales of the 2,500 shares of Dynamic stock and in eliminating the same from the petitioner's income for 1959. The inclusion of these profits in income of 1958 will affect the amount of the medical deduction to which the petitioners are entitled for that year. The proper amount of such medical deduction will be computed in connection with the recomputation under Rule 50.

*Decision will be entered under Rule 50.*