T.C. Memo. 2006-174


UNITED STATES TAX COURT


JOHN S. AND CHRISTOBEL D. RENDALL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16337-04.                    Filed August 21, 2006.


        P husband (PH) was CEO and chairman of the board
of SE Corp., which had developed a process for
recovering synthetic crude oil and other minerals from
oil sands.  In March 1997, as part of an effort to
finance completion of an oil recovery plant in Canada
using SE Corp.'s technology, PH lent SE Corp. $2
million from funds borrowed from Merrill Lynch (ML)
through his ML margin account.  PH pledged a portion of
his SE Corp. common stock as security for loans to him
through that account.  In May 1997, ML demanded
repayment of PH's margin account loans and, upon
default by PH, ML sold a portion of the pledged shares
and returned the balance to PH.  In June and July 1997,
SE Corp. filed petitions in the U.S. and Canada for
reorganization in bankruptcy.  In September 1997, SE
Corp. stock was delisted by NASDAQ and thereafter was
listed in the "pink sheets" and traded over the
counter.  Although forced to sell its Canadian

operating assets and mineral leases in order to generate cash to pay creditors, and faced with other difficulties (e.g., an SEC investigation, delinquent SEC mandatory filings, and class action lawsuits), SE Corp. emerged from bankruptcy in 1998 still owning its technology and various U.S.-based assets and personnel, and with plans to commercialize its technology in the near future. On Dec. 31, 1997, SE Corp.'s common stock was trading at $3 a share.

The issues for decision, all involving taxable year 1997, are: (1) Whether Ps are taxable on ML's sale of pledged shares; (2) if taxable on that sale, whether they may compute PH's basis in the shares under a LIFO (as opposed to a FIFO) method for computing basis; (3) whether they are entitled to a $2 million business (or, alternatively, nonbusiness) bad debt deduction for the worthlessness of PH's $2 million loan to SE Corp.; and (4) whether they are entitled to a worthless stock loss deduction for the worthlessness of PH's SE Corp. common stock.

1. <u>Held</u>: Ps are taxable on ML's sale of pledged shares.

2. <u>Held</u>, <u>further</u>, PH's bases in the pledged shares sold by ML must be computed on a FIFO basis.

3. <u>Held</u>, <u>further</u>, Ps are not entitled to any bad debt deduction for the worthlessness of PH's $2 million loan to SE Corp.

4. <u>Held</u>, <u>further</u>, Ps are not entitled to a worthless stock loss deduction for the worthlessness of PH's SE Corp. common stock.


<u>Charles E. Anderson</u>, for petitioners.

<u>Vicki L. Miller</u>, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency (the notice),
respondent determined a deficiency of $259,874 in petitioners'
1997 Federal income tax.  By the petition, petitioners assign
error to respondent's determination.  Petitioners also assign
error to respondent's denial of their claims for refund for 1997.
The allowance of one or more of those claims would result in a
refund of $45,400, the amount of tax petitioners paid for 1997.[1]
After concessions,[2] the issues for decision are whether
petitioners are entitled to:  (1) Avoid paying tax on the 1997
sale of 634,100 shares of Solv-Ex Corp. (Solv-Ex) common stock
issued to petitioner John S. Rendall (Mr. Rendall) on the ground
that they received no benefit from the proceeds of the sale; (2)
alternatively, if they are held to be taxable on that sale,

---

[1]  Petitioners' originally filed 1997 return reports total
tax due of $383,632, total tax payments of $45,400, and an amount
owed equal to the difference, $338,232 (mistakenly computed to be
$338,630 on the return).  Pursuant to sec. 6211(a), Internal
Revenue Code of 1986, as amended, the notice determines a
deficiency equal to the excess of the tax properly due, $643,506,
over the tax shown on the return, $383,632.  The parties
stipulate that the $338,630 originally reported by petitioners as
the amount owed for 1997 has never been paid, except for
$2,001.89 collected as offsets to refunds due petitioners for
2001 and 2002.  The record does not indicate whether the balance
has been assessed pursuant to sec. 6201(a)(1), Internal Revenue
Code of 1986, as amended.

[2]  Petitioners concede that petitioner Christobel Rendall is
not entitled to relief from joint and several liability (innocent
spouse relief) with respect to any deficiency or underpayment for
1997.

compute their long-term capital gain therefrom by using a last-in-first-out (LIFO) method for computing cost basis, as they allege, or by using a first-in-first-out (FIFO) method for computing cost basis, as respondent alleges (the LIFO/FIFO basis issue); (3) a $2 million nonbusiness bad debt deduction in 1997 as the result of the worthlessness in that year of a $2 million debt from Solv-Ex to Mr. Rendall; (4) alternatively, a $2 million business bad debt deduction as a result of that alleged worthlessness; and (5) a worthless stock loss deduction for the worthlessness, in 1997, of either Mr. Rendall's remaining common stock in Solv-Ex after the sale of 634,100 shares or (assuming the sale of those shares is held not to be taxable to petitioners) his common stock interest in Solv-Ex, including those 634,100 shares.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, 1997, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT[3]

Some facts are stipulated and are so found. The stipulation

---

[3] To the extent that petitioners or respondent fail to set forth objections to the other's proposed findings of fact, we conclude that those proposed findings of fact are correct except to the extent that the nonobjecting party's proposed findings of fact are clearly inconsistent therewith. See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

of facts, with accompanying exhibits, is incorporated herein by this reference.

At the time the petition was filed, petitioners resided in Albuquerque, New Mexico.

Solv-Ex's Formation and Operations Through March 1997

Solv-Ex was incorporated on July 2, 1980, under New Mexico law. Mr. Rendall and another individual were the founding shareholders. Mr. Rendall purchased 2,700,000 shares of Solv-Ex common stock at a cost of 1 cent a share at the company's initial offering of stock on July 2, 1980. Beginning on July 17, 1981, and ending on August 7, 1996, Mr. Rendall's common stock interest in Solv-Ex underwent a net increase to 3,162,860 shares.[4] Mr. Rendall served as chief executive officer (CEO) and chairman of the board of Solv-Ex from its inception through November 1, 2000, when he resigned.

Solv-Ex's business activity consisted of researching and developing a process to extract bitumen from oil sands and convert it into a synthetic crude oil. Solv-Ex claimed to have developed a cost-effective method to extract and process oil and industrial minerals from oil sands. Solv-Ex also claimed to have developed a patented process to recover raw aluminum and other marketable mineral products from the fine clays contained in oil

---

[4] During that period, Mr. Rendall purchased a total of 677,860 shares at prices ranging from 1 cent to $19 a share, and he sold 215,000 shares.

sands or in the waste tailings that result after the oil sands are processed.  Solv-Ex contended that the value of those marketable minerals was three times the value of the oil produced from the oil sands.

Beginning in 1981 with its initial public offering, Solv-Ex was a public company, and its shares were traded on the NASDAQ Small Cap Market.  Its financial statements reflected its status as a "development stage enterprise" in accordance with Statement of Financial Accounting Standards No. 7 (FAS 7), which includes in the description of such companies a company for which "[p]lanned principal operations have not commenced * * * [or] [p]lanned principal operations have commenced, but there has been no significant revenue therefrom."

During 1995, Solv-Ex acquired a 90-percent interest in oil sands leases in Alberta, Canada (the leases).  After performing feasibility studies for development and commercial operation of the leases, Solv-Ex decided to develop the leases and raise the capital required to construct an oil extraction and upgrading plant in Alberta at an estimated cost of $125 million.  In 1996, Solv-Ex was able to raise only $77 million through the sale of convertible debentures and stock.  Because that was less than the estimated construction cost for the plant, Solv-Ex decided to modify its plans and build only an initial stage plant in Alberta, the remaining facilities to be built later.  Solv-Ex's

inability to secure the funds needed to construct a full-scale commercial plant in 1997 was due to the October 1996 decision by Deutsche Bank to renege on a "handshake deal" between Solv-Ex and a subsidiary of Deutsche Bank (made before the latter's acquisition of the subsidiary) whereby Solv-Ex was to receive $100 million of financing in January 1997.

Construction of the initial stage plant began in August 1996, and with the testing of the plant's operation in March 1997, was then complete. The plant produced 600 gallons of good-quality oil during a 12-hour period on March 31, 1997, thereby demonstrating the viability of Solv-Ex's oil extraction process.

1997 Efforts To Complete the Initial Stage Oil Recovery Plant

In early 1997, still intent on completing the initial stage plant,[5] Mr. Rendall pursued alternative financing for Solv-Ex. On March 26, 1997, Mr. Rendall made a $2 million loan to Solv-Ex (the $2 million loan) from funds borrowed from Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) through Mr. Rendall's Merrill Lynch margin account[6]. The $2 million loan (which, in form, constituted a $2 million wire transfer from Merrill Lynch to Solv-Ex's bank account) increased Mr. Rendall's

[5] Plant modifications were necessary in order to enable the plant to run continuously.

[6] Mr. Rendall established that account on Mar. 20, 1997, by transferring his existing Smith Barney & Co. margin account to Merrill Lynch.

total indebtedness against his Merrill Lynch margin account to $4 million. Mr. Rendall made the $2 million loan as an inducement to outside lenders to put up an additional $20 million of financing for Solv-Ex. Solv-Ex used the $2 million received from Mr. Rendall (plus an additional $10 million received from three outside lenders in April 1997 in exchange for convertible debentures) to continue work on the initial stage plant.

Mr. Rendall's Pledge of Solv-Ex Common Stock to Merrill Lynch

In order to receive a line of credit through his Merrill Lynch margin account, Mr. Rendall, on March 20, 1997 (the same day he opened the account), executed a document entitled "Pledge Agreement For Lending on Shelf Registered, Control or Restricted Securities" (the pledge agreement). Pursuant to the terms of the pledge agreement, Mr. Rendall pledged 2,610,000 shares of Solv-Ex common stock "as security for the repayment of indebtedness of the pledgor to the pledgee." Also, pursuant to the pledge agreement, any loans made by Merrill Lynch thereunder were payable on demand. On April 3, 1997, Mr. Rendall pledged an additional 50,000 shares of Solv-Ex common stock as collateral for loans from Merrill Lynch through his margin account. Of the 2,660,000 shares of Solv-Ex stock pledged to Merrill Lynch, 2,500,000 shares consisted of certificates for stock purchased by Mr. Rendall for 1 cent a share in 1980. The certificates for the

remaining 160,000 pledged shares consisted of stock he purchased at various times after 1980.

Merrill Lynch's Sale of the Pledged Stock

On May 2, 1997, Merrill Lynch sent a letter to Mr. Rendall demanding payment of the margin loan in the amount of $4,195,022.80, "plus all accrued interest", by May 9, 1997. If Mr. Rendall failed to repay the margin loan by that date, Merrill Lynch stated that it would liquidate sufficient shares of Solv-Ex stock from the margin account to cover the margin debt. The letter further stated that, if $2 million were received by May 9, the due date for the balance would be extended until May 16, 1997.

In ensuing correspondence between Merrill Lynch or counsel for Merrill Lynch and Solv-Ex and/or counsel for Solv-Ex, counsel for Solv-Ex disputed and counsel for Merrill Lynch defended Merrill Lynch's right, under the Federal securities laws, to sell the pledged stock. In a letter dated May 22, 1997, Merrill Lynch requested Solv-Ex and its transfer agent to register 1,100,000 shares of the pledged Solv-Ex stock for transfer in the name of Merrill Lynch. In a response to that letter and in a letter to the transfer agent, both dated May 27, 1997, counsel for Solv-Ex acknowledged that the requested reregistration/reissuance of shares was accomplished by the transfer agent without permission to do so from either Solv-Ex or counsel for Solv-Ex.

Merrill Lynch filed with the Securities and Exchange Commission (SEC) a Form 144, Notice of Proposed Sale of Securities Pursuant to Rule 144 under the Securities Act of 1933 (the Form 144)[7], dated May 28, 1997.  The Form 144 notified the SEC of the possible sale of 1,100,000 shares of Solv-Ex common stock acquired on account of a "Default of Margin Loan", but included a statement that "[p]ledgee intends to sell the number of shares required to satisfy the indebtedness of pledgor."  The Form 144 lists Merrill Lynch as the "person for whose account the securities are to be sold" and Mr. Rendall as pledgor.  Merrill Lynch signed the Form 144 as pledgee.

From May 28 through June 4, 1997, Merrill Lynch sold 634,100 shares of the pledged Solv-Ex common stock in lots ranging from 2,000 to 40,000 shares and at prices ranging from $6 to $7.625 a share.  The total net sale proceeds from the sales of those shares was $4,229,479.  Mr. Rendall did not identify the specific shares of Solv-Ex common stock pledged to Merrill Lynch that were to be sold.  At the end of June 1997, Merrill Lynch returned to Mr. Rendall a single stock certificate, which comprised the shares of the pledged Solv-Ex common stock not sold by Merrill Lynch.

---

[7] Rule 144 (17 C.F.R. sec. 230.144 (2006)) was promulgated by the SEC.

## Failure To Complete the Initial Stage Plant

Solv-Ex had continued to make modifications to its initial stage plant in Alberta during April 1997, but, because it could not obtain anticipated financing, Solv-Ex began to mothball the plant in late May 1997.

Toward the end of June 1997, Mr. Rendall, on behalf of Solv-Ex, continued his attempts to obtain financing for the completion of the initial stage plant, this time by offering to sell a part of the company to a large oil company. Those attempts proved unsuccessful when the prospective buyer of a 1/2-interest in Solv-Ex backed out of the proposed deal upon learning from Mr. Rendall that Solv-Ex would be filing for bankruptcy protection under Canadian law as a means of avoiding the filing of a lien by a large unpaid creditor.

## Solv-Ex's Bankruptcy Reorganizations

On July 14, 1997, Solv-Ex filed a petition for bankruptcy protection in Canada under the Companies' Creditors Arrangement Act, the Canadian equivalent of a filing under chapter 11 of the United States Bankruptcy Code (the Canadian bankruptcy). On August 1, 1997, Solv-Ex filed a petition under the said chapter 11 in the U.S. Bankruptcy Court for the District of New Mexico (the U.S. bankruptcy). The two bankruptcy cases (the joint bankruptcies) were jointly administered by each country's

respective court pursuant to a cross-border insolvency protocol agreement.

On October 24, 1997, Mr. Rendall filed a proof of claim in the Canadian bankruptcy, which included his unsecured claim for the $2 million loan.  That claim was disallowed, whereupon, on December 1, 1997, he filed a motion objecting to the claim disallowance in which he contested the bankruptcy court's treatment of the $2 million loan as a debenture rather than as an unsecured claim.  Ultimately, on September 9, 1998, in satisfaction of his $2 million claim (plus accrued interest) in the U.S. bankruptcy, Mr. Rendall received 5,728,767 shares of new common stock of Solv-Ex.  The number of shares was determined under a formula applicable to certain convertible debenture holders that was set forth in the Second Amended Plan of Reorganization for Solv-Ex, dated June 23, 1998 (the plan of reorganization), and was based upon the closing bid price per share on the date immediately preceding the date of conversion, which turned out to be 50 cents a share.

During the course of the joint bankruptcies, Solv-Ex sold its interest in the leases and its oil production facilities and equipment in Canada to two separate buyers:  (1) A 78-percent interest to Koch Exploration Canada, Ltd. (Koch), in exchange for Can$30 million, with Koch also receiving warrants (exercisable for a limited time) to purchase 2 million shares of Solv-Ex

common stock at a discount; and (2) its remaining 12-percent interest to United Tri Star Resources, Ltd.(UTS), which already held a 10-percent interest in those assets, in exchange for $3 million and 5 million shares of UTS common stock. Both of those sales closed in March 1998, although Solv-Ex had entered into a preliminary agreement with Koch on November 14, 1997.

As part of the agreement with Koch, Solv-Ex retained ownership of its hydrocarbon extraction technologies, its technologies for mineral and metal extraction, and the rights to develop the leases for the recovery of such minerals and metals. Solv-Ex also retained numerous process patents in the United States, Canada, and other countries covering its bitumen and mineral extraction technologies, both for oil sands and oil shale. In addition, Solv-Ex retained other assets, including 1.5 acres of land in Albuquerque, New Mexico, upon which a research facility, office space, a pilot plant, an acid plant, and machinery and equipment were situated. It also continued to employ a team of research engineers for a possible fresh start.

In the business plan set forth in its amended disclosure statement filed in the U.S. bankruptcy on June 23, 1998 (the amended disclosure statement), Solv-Ex set forth its intention to focus on: (1) Commercializing its Ti02S technology, Solv-Ex's trade name (for which it had applied for a trademark) for a substitute filler and pigment for titanium dioxide useful in the

paper, paint, and plastics industries; (2) supporting the licensing of Solv-Ex's bitumen extraction process technology; and (3) "obtaining a joint venture partner for a project that will establish a major alumina and aluminum reduction production facility in Alberta, Canada, or at another site yet to be determined." The business plan was developed with a goal of bringing a reorganized Solv-Ex to the point of positive cashflow by the year 2000.

On April 24 and May 14, 1998, Solv-Ex entered into memorandums of understanding (MOUs) with two separate companies (one a Venezuelan company) to jointly explore the development and production of Solv-Ex's Ti02S technology for commercial use. Those MOUs were part of Solv-Ex's business plan.

In an exhibit attached to the amended disclosure statement, Solv-Ex stated that the Koch and UTS sales provided a means for the satisfaction of substantially all of the nonsubordinate, nondebenture debt, and that the proposed business plan would allow "the Reorganized Solv-Ex emerging from chapter 11 protection to move forward with the commercial development of its valuable technologies in Ti02S, alumina and aluminum production."

On July 31, 1998, the U.S. Bankruptcy Court for the District of New Mexico approved the plan of reorganization, effective August 31, 1998. A similar order was entered in the Canadian bankruptcy. Upon confirmation of the plan of reorganization,

Solv-Ex emerged from bankruptcy in both the United States and Canada, and it continued to operate.

Solv-Ex's SEC Problems

Because of the joint bankruptcies and its inability to obtain audited financial statements, Solv-Ex failed to file a Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, with the SEC for the year ended June 30, 1997,[8] as required under the Securities Exchange Act of 1934. That report was due to be filed on or before September 28, 1997. For the same reasons, Solv-Ex failed to file quarterly reports on Form 10-Q (the quarterly report under Section 13 or 15(d)) for the quarters ended September 30 and December 31, 1997. As of mid-June 1998, Solv-Ex still intended (and expected to be able) to file the delinquent reports and subsequent reports becoming due in the near future.

In March 1996, the SEC initiated an investigation involving the relationship between Solv-Ex and another company. Subsequently, in 1997, SEC staff members sent letters to Solv-Ex advising that the staff intended to recommend that the SEC seek an injunction against Solv-Ex and certain individuals, including Mr. Rendall, for Federal securities laws violations; i.e., the

---

[8] Solv-Ex kept its books on a June 30 fiscal year basis.

making of false and misleading statements regarding the company's operations.[9]

## Litigation Involving Solv-Ex

In October, November, and December 1996, Solv-Ex, Mr. Rendall, and other officers of Solv-Ex were made defendants in class action suits brought by Solv-Ex shareholders alleging false and misleading statements relating to Solv-Ex in violation of both Federal and New Mexico securities laws. The claims alleged in those lawsuits were recognized as claims in the joint bankruptcies, or the action was stayed by reason of the chapter 11 bankruptcy. In the amended disclosure statement, Solv-Ex expressed its intent "to vigorously defend the actions filed against it", and it stated its belief that those actions were "without merit".

On August 9, 1996, Solv-Ex sued certain individuals and entities in the U.S. District Court for the Southern District of New York, seeking damages in excess of $12 million for actions intended to further the defendants' short selling schemes. The suit was dismissed without prejudice because of the bankruptcy proceedings. In the amended disclosure statement, Solv-Ex stated its intent to refile the suit following its discharge from bankruptcy. In October and December 1998, Solv-Ex brought suits

---

[9] The SEC did commence such an action in Federal District Court on July 20, 1998.

against Deutsche Bank and others, with a potential recovery of $100 million, which accused the defendants of actions that had negatively affected the value of its stock.

Solv-Ex's Operations After Discharge From Bankruptcy

Because of a change in the Venezuelan Government in late 1998 that led to the dissolution of one of Solve-Ex's prospective Venezuelan partners, the Venezuelan project for the commercialization of Solv-Ex's Ti02S technology never materialized.

Upon emerging from bankruptcy in August 1998, Solv-Ex retained its technologies and other assets, including the land, office building, research facility, pilot plant, acid plant, and machinery and equipment in Albuquerque, New Mexico, plus various tax refunds and other claims. It retained employees to oversee its continued research and development efforts with respect to its technologies.

Solv-Ex continued to seek funding for future operations, and to that end, in November 1998, it raised $812,000 through a private placement of 1,624,000 shares of new common stock and 919,400 stock warrants. At the time of the trial, Solv-Ex had never earned a profit, had not produced for sale any oil or other products, and had not had any sales from its research and development technologies. Nor had it been successful in recovering any amount from any lawsuit. Moreover, as of October

2000, it still was remiss in filing many of its required SEC Forms 10-K and 10-Q for the years 1997 through 2000.

On November 1, 2000, Mr. Rendall resigned as CEO and chairman of the board of Solv-Ex, and he was replaced in both roles by Frank Ciotti (Mr. Ciotti), who had previously been the company's chief financial officer.

Solv-Ex's Financial Statements

The record does not contain any financial statements (in particular, there is no balance sheet) reflecting Solv-Ex's financial position as of December 31, 1997. A set of unaudited financial statements is attached as an exhibit to the amended disclosure statement. Those statements include a balance sheet for Solv-Ex and subsidiaries[10] as of March 31, 1997, which shows total assets of $105,451,134 and total liabilities of $58,378.781. An independent auditor's report dated January 27, 1999, contains an audited balance sheet for Solv-Ex and subsidiaries as of August 31, 1998. It shows total assets of $6,174,772 and total liabilities of $8,121,573. Included in liabilities is the $2 million loan that was subsequently satisfied by Mr. Rendall's receipt of 5,728,767 shares of Solv-Ex common stock.

---

[10] For a period including at least a part of 1997, Solv-Ex conducted research and development activities through two subsidiary corporations, and it used a third subsidiary to supply employees to run its initial stage plant.

During 1997, Solv-Ex's largest debt obligation was a $33 million convertible debenture held by Phemex Establishment (Phemex), a Liechtenstein entity, which was created on April 21, 1996, under a convertible loan agreement.  Solv-Ex was prepared to assert offsetting claims against Phemex and its affiliates.  Phemex failed to file a proof of claim in either the U.S. or the Canadian bankruptcy by the deadlines established for such filings (January 31, 1998, in the U.S. bankruptcy).  Therefore, Phemex was deemed to have waived its claim entirely, and the claim was disallowed in the joint bankruptcies.

Trading in Solv-Ex Common Stock

Before the joint bankruptcies, the principal market in which Solv-Ex's common stock was traded was the NASDAQ Small-Cap Market.  As a result of developments in the bankruptcy proceedings, NASDAQ delisted the Solv-Ex common stock on September 17, 1997.  Thereafter, the stock traded over the counter in what is commonly referred to as the "pink sheets".

During the first quarter of 1997, Solv-Ex common stock traded between a high of $21.50 and a low of $10 a share.  During the succeeding quarter ended June 30, 1997, which included Merrill Lynch's sales of pledged stock, Solv-Ex common stock traded between a high of $14.125 and a low of $3 a share.  As of December 31, 1997, the stock was trading over the counter at approximately $3 a share.  The stock continued to trade over the

counter in 1998 and averaged at or near $1.25 a share for the
trading days immediately prior to the end of May 1998.  On July
28, 1998, the stock traded at $.875 a share.

Petitioners' 1997 Return and Amended Returns

On the Schedule D, Capital Gains and Losses, attached to
their original 1997 return, filed October 15, 1998, petitioners
used a LIFO (last stock purchased, first stock sold) method for
determining Mr. Rendall's basis in the 634,100 shares of Solv-Ex
common stock pledged to and sold by Merrill Lynch.  Petitioners
reported total basis for those shares of $1,305,714 and total
gain of $2,923,765 ($4,229,479 - $1,305,714).

On April 14, 1999, March 18, 2002, and January 22, 2003,
petitioners filed four amended returns (the first through fourth
amended returns).[11]  All of the amended returns report a net loss
for 1997 and claim a refund of $45,400, petitioners' total tax
payments for that year.  There are differences among them,
however, particularly with respect to both the amounts of loss
and the bases for the loss.

The first amended return differs from the original return by
claiming a nonbusiness bad debt deduction (short-term capital
loss) for the worthlessness of the $2 million loan.  The second

_____

[11]  Both the third and the fourth amended returns were filed
on Jan. 22, 2003.

amended return claims a business bad debt deduction (ordinary loss) for the worthlessness of the $2 million loan.[12]

The third amended return adds a claim for a worthless stock loss attributable to the worthlessness of Mr. Rendall's Solv-Ex common stock remaining after Merrill Lynch's sale of the pledged shares. That deduction results in a pro tanto decrease in the capital gain and increase in the net loss reported on the first and second amended returns.

On the Schedule D attached to the fourth amended return, petitioners omit the gain from Merrill Lynch's sale of the pledged Solv-Ex common stock. Instead, they claim a worthless stock loss equal to Mr. Rendall's total cost basis in all of his Solv-Ex shares, including the shares pledged to Merrill Lynch. In the "Explanation of Changes to Income, Deductions, and Credits", petitioners describe the purpose of the fourth amended return as follows: "To writeoff Solv-Ex worthless stock and remove sales proceeds [from Merrill Lynch's sale of the pledged shares] which taxpayer incorrectly reported." That change results in a net capital loss for 1997 (deducted to the extent of $3,000 pursuant to section 1211(b)) and a substantial increase in

---

[12] The first and second amended returns report the same 1997 net loss. Nonetheless, assuming there was a 1997 bad debt, the business versus nonbusiness bad debt issue is not moot because the resolution of that issue directly bears upon the amount of petitioners' net operating loss carryback/carryover from 1997.

petitioners' total 1997 net loss over the net loss reported on the third amended return.

OPINION

## I. Burden of Proof

Petitioners argue that, pursuant to section 7491(a), the burden of proof "has shifted to" respondent with respect to all of the factual issues. Petitioners further argue that respondent conceded at trial that he bears the burden of proof on all issues except the LIFO/FIFO basis issue, and that respondent bears the burden of proof on that issue as well because petitioners have "met the preconditions of Section 7491 on * * * [that] issue."

Generally, a taxpayer in this court bears the burden of proof. Rule 142(a)(1). In certain circumstances, however, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, section 7491 shifts the burden of proof to the Commissioner. Sec. 7491(a)(1); Rule 142(a)(2). Credible evidence is evidence the court would find sufficient upon which to base a decision on the issue in favor of the taxpayer if no contrary evidence were submitted. See Higbee v. Commissioner, 116 T.C. 438, 442 (2001); Bernardo v. Commissioner, T.C. Memo. 2004-199 n.6. Section 7491(a)(2) imposes certain prerequisites to the application of section 7491(a)(1), including that the taxpayer must have

complied with the requirements under the Internal Revenue Code "to substantiate any item". Sec. 7491(a)(2)(A).

At trial, respondent conceded that "the preconditions set forth in section 2 [section 7491(a)(2)] have been met, with the exception of the fact that the taxpayer has not * * * maintained or provided records necessary for the identification of the sale of the stock pertaining to the LIFO/FIFO issue." That is not a concession by respondent that he bears the burden of proof on all issues except the LIFO/FIFO basis issue. It is merely a concession that petitioners have satisfied the section 7491(a)(2) prerequisites to the application of section 7491(a)(1) to those issues. Respondent argues that petitioners retain the burden of proof on all issues because they have failed to present "credible evidence" in support of their position on each issue as required by section 7491(a)(1).

As discussed infra, petitioners have failed to introduce credible evidence that: (1) They are not taxable on the sale of 634,100 shares of Solv-Ex common stock pledged to Merrill Lynch; (2) they may determine Mr. Rendall's basis in those shares under the LIFO method for determining cost basis; and (3) the $2 million loan and Mr. Rendall's Solv-Ex common stock became worthless in 1997. Therefore, petitioners retain the burden of proof with respect to those issues pursuant to Rule 142(a), a burden that, because of the absence of credible evidence,

petitioners cannot sustain.  See Bernardo v. Commissioner, supra at n.7.

II.  Attribution to Mr. Rendall of the Sale Proceeds From Merrill Lynch's Sale of Pledged Solv-Ex Common Stock

On brief, petitioners argue that, because Merrill Lynch sold 634,100 of the pledged shares "for their own purposes" (i.e., "for Merrill Lynch's protection of their massive short position"), the income from that sale is taxable to Merrill Lynch.  Petitioners further argue that because those shares had been reissued in Merrill Lynch's name before their sale by Merrill Lynch, Merrill Lynch "should bear the tax consequences on such sale."  Petitioners discount the fact that the shares were acquired by Merrill Lynch pursuant to the pledge agreement on the ground that that agreement "was fraudulently procured in light of all the facts."

In response to petitioners' arguments, respondent argues that:  (1) The pledge agreement was valid; (2) under it, Mr. Rendall, as pledgor, retained ownership of the pledged shares; (3) the proceeds from the sale of pledged shares were used to discharge Mr. Rendall's indebtedness to Merrill Lynch and, therefore, benefited Mr. Rendall; and (4) any reissuance of pledged shares in Merrill Lynch's name was "done to facilitate Merrill Lynch's sale [of the shares] as pledgee", not to transfer ownership of the pledged shares to Merrill Lynch.  Respondent

concludes: "Therefore, in light of the facts, the gain from the sale of such stock is properly taxable to Mr. Rendall."

We agree with respondent. There is no evidence in the record to indicate that the pledge agreement was "fraudulently procured", as petitioners allege, nor is there any evidence that Merrill Lynch sold the 634,100 shares of pledged Solv-Ex common stock in any capacity other than as a pledgee in order to satisfy Mr. Rendall's debt to it. Merrill Lynch sold only enough shares to satisfy Mr. Rendall's outstanding debt obligation under his margin loan account.[13] The remaining pledged shares were returned to Mr. Rendall within 1 month from the last sale of pledged stock. Those circumstances suggest that Merrill Lynch's sole purpose in securing the pledge of Solv-Ex common stock from Mr. Rendall, and his sole purpose in pledging that stock, was to provide security for the repayment of his debt to Merrill Lynch, and we so find.

Petitioners suggest that Merrill Lynch's demand for repayment of the margin loan was unwarranted because, at that time, the value of the pledged shares was over $40 million, and

[13] On May 2, 1997, Merrill Lynch demanded repayment by Mr. Rendall of $4,195,022.80 "plus all accrued interest". The sale of 634,100 pledged shares between May 28 and June 4, 1997, generated net sales proceeds of $4,229,479. There is no evidence that Merrill Lynch paid to Mr. Rendall, or that Mr. Rendall demanded from Merrill Lynch, the $34,456.20 difference. Therefore, we infer that that difference constituted all or a portion of the accrued interest referred to in Merrill Lynch's May 2, 1997, letter to Mr. Rendall.

Solv-Ex had recently demonstrated, at its initial stage plant, the viability of its oil sands technology. Merrill Lynch's motivation for demanding repayment of the margin loan when it did is irrelevant. Pursuant to the pledge agreement, Mr. Rendall's margin loan was payable on demand, and there is no dispute that he failed to repay the loan during the period Merrill Lynch allotted for repayment. Also, Mr. Rendall benefitted by having his debt to Merrill Lynch discharged by the sale of pledged shares.[14]

As the pledgor of the Solv-Ex common stock held by Merrill Lynch, Mr. Rendall remained the owner of and, therefore, was taxable on Merrill Lynch's sale of the pledged shares. As stated by the Court of Appeals for the First Circuit in Old Colony Trust Associates v. Hassett, 150 F.2d 179, 182 (1st Cir. 1945): "A pledgee who has not foreclosed has only a special interest or property in the stock during the continuance of the pledge. The pledgor retains the title and gains from sales of the collateral are taxed to the pledgor." See also Joyce v. Commissioner, 42

---

[14] Petitioners do not address the consequence of the discharge of Mr. Rendall's indebtedness to Merrill Lynch if Merrill Lynch, pursuant to petitioners' theory, sold the Solv-Ex shares in question for its own account. On brief, petitioners claim "the proceeds were assigned to cover Rendall's debt to Merrill Lynch". Perhaps petitioners' position is that they sustained a theft loss equal to their basis in the shares sold and an item of (ordinary) gross income equal to the amount of debt discharged. See secs. 61(a)(12), 165(b).

T.C. 628, 636-637 (1964); <u>Ligon v. Commissioner</u>, 37 B.T.A. 763, 765 (1938).

III. <u>Mr. Rendall's Basis in the Pledged Stock Sold by Merrill Lynch (The LIFO/FIFO Basis Issue)</u>

Both parties cite section 1.1012-1(c), Income Tax Regs., in support of their respective positions regarding Mr. Rendall's cost basis for the 634,100 shares of Solv-Ex common stock sold by Merrill Lynch. That provision states, in pertinent part, as follows:

§ 1.1012-1 <u>Basis of property</u>.

\* \* \* \* \* \* \*

(c) <u>Sale of stock</u>. (1) <u>In general</u>. If shares of stock in a corporation are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred shall be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock \* \* \*. If, on the other hand, the lot from which the stock is sold or transferred can be adequately identified, the rule stated in the preceding sentence is not applicable. As to what constitutes "adequate identification," see subparagraphs (2), (3), and (4) of this paragraph.

(2) <u>Identification of stock</u>. An adequate identification is made if it is shown that certificates representing shares of stock from a lot which was purchased or acquired on a certain date or for a certain price were delivered to the taxpayer's transferee. Except as otherwise provided in subparagraph (3) or (4) of this paragraph, such stock certificates delivered to the transferee constitute the stock sold or transferred by the taxpayer. Thus, unless the requirements of subparagraph (3) or (4) of this paragraph are met, the stock sold or transferred is charged to the lot to which the certificates

delivered to the transferee belong, whether or not the taxpayer intends, or instructs his broker or other agent, to sell or transfer stock from a lot purchased or acquired on a different date or for a different price.

(3) <u>Identification on confirmation document</u>.  (i) Where the stock is left in the custody of a broker or other agent, an adequate identification is made if --

(<u>a</u>) At the time of the sale or transfer, the taxpayer specifies to such broker or other agent having custody of the stock the particular stock to be sold or transferred, and

(<u>b</u>) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or other agent.

Stock identified pursuant to this subdivision is the stock sold or transferred by the taxpayer, even though stock certificates from a different lot are delivered to the taxpayer's transferee.

Petitioners argue that Merrill Lynch's actions in selling 634,100 of the pledged shares "precluded [Mr. Rendall] from making any identification at or about the time of the sale by Merrill Lynch", and that their "first opportunity" to identify the shares sold was in connection with the preparation and filing of their 1997 return.  Petitioners conclude that they made adequate identification of the shares sold on Schedule D of their 1997 return.

Respondent argues that "Mr. Rendall was well aware that Merrill Lynch intended to sell a portion of the pledged stock to satisfy his margin loan debt" and, "[d]espite knowing of Merrill Lynch's intentions * * *, petitioners made no attempt to comply

with the adequate identification requirements." Respondent concludes that, because "[a]t the time of the sale" Mr. Rendall failed to specify to Merrill Lynch the shares to be sold, as required by section 1.1012-1(c)(3)(i)(a), Income Tax Regs., there was no "adequate identification" of the sold shares. Therefore, Mr. Rendall's cost basis in those shares must be determined by applying the FIFO method.

Again, we agree with respondent. The May 1997 correspondence described supra involving Merrill Lynch, Solv-Ex, and counsel for each demonstrates that the two sides were in communication before the sale of pledged shares. In late May, when the sale of pledged shares appeared inevitable, Solv-Ex, on behalf of Mr. Rendall, could have identified to Merrill Lynch the shares to be sold; e.g., by making that identification in the May 27, 1997, letter from counsel for Solv-Ex to counsel for Merrill Lynch acknowledging the transfer of the pledged shares to Merrill Lynch's name. In fact, Mr. Rendall testified at trial that he could have identified the stock to be sold at or before the time of sale. Therefore, we find that Mr. Rendall was not precluded by Merrill Lynch from identifying those shares "At the time of the sale", which would have satisfied the requirements of section 1.1012-1(c)(3)(i)(a), Income Tax Regs.

Mr. Rendall's testimony and an unobjected-to proposed finding of fact based upon that testimony establish that he

purchased 2.5 million of the 2,660,000 shares pledged to Merrill Lynch in 1980 for 1 cent a share, and we have so found. Petitioners also do not object to respondent's proposed finding of fact that the stock certificates given to Merrill Lynch for the remaining 160,000 pledged shares represented shares Mr. Rendall purchased at various times after 1980, and we have so found. Because the selling shareholder may do no more than select and identify shares for sale from among the shares "left in the custody of a broker or other agent," no more than 160,000 of the 634,100 pledged shares Merrill Lynch sold on Mr. Rendall's behalf could have been identified by him as having been purchased for more than 1 cent a share. Sec. 1.1012-1(c)(3), Income Tax Regs. Thus, at least 474,100 (634,100 - 160,000) of the sold shares had a cost basis to Mr. Rendall of 1 cent a share. See also Kluger Associates, Inc. v. Commissioner, 617 F.2d 323, 327-328 (2d Cir. 1980), affg. 69 T.C. 925 (1978).

Moreover, Mr. Rendall failed to adequately identify the other 160,000 pledged shares sold by Merrill Lynch. Petitioners' purported identification on their 1997 originally filed and amended returns was inadequate for two reasons: (1) Those returns did not specify which of Mr. Rendall's shares purchased after 1980 at more than 1 cent a share constituted the 160,000 shares pledged to Merrill Lynch; and (2) even if those shares had been identified on petitioners' 1997 returns, that identification

would not have been timely since it would not have been "[a]t the time of the sale" as required by section 1.1012-1(c)(3)(i)(a), Income Tax Regs. See also Hall v. Commissioner, 92 T.C. 1027, 1039 (1989) (taxpayer not permitted to avoid application of the FIFO method by waiting "until the end of a year to allot specific sales to his general inventory of stocks in such a manner as to be most beneficial to him taxwise").

We hold that petitioners have failed to introduce credible evidence that they adequately identified, on a LIFO basis, any portion of the 634,100 pledged shares sold by Merrill Lynch. Therefore, we sustain respondent's application of the FIFO method for determining Mr. Rendall's basis in those shares. Because the number of pledged shares constituting shares Mr. Rendall purchased for 1 cent a share in 1980 at the initial offering of Solv-Ex common stock (2.5 million) was well in excess of the 634,100 pledged shares sold by Merrill Lynch, respondent properly determined that Mr. Rendall's FIFO basis in the sold shares was $6,341 (634,100 x 1 cent), and that petitioners' long-term capital gain on the sale of those shares was $4,223,138 ($4,229,479 - $6,341).

## IV. Bad Debt Deduction

### A. Law

Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year." To provide credible

evidence of worthlessness in 1997, petitioners must show that the $2 million loan had value at the beginning of 1997 and became worthless during that year.  Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), affd. in part, revd. in part on other grounds and remanded 318 F.3d 924 (9th Cir. 2003).  The determination depends upon the particular facts and circumstances of each case, although, generally, "the year of worthlessness is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery."  Id. at 204-205; see also Estate of Mann v. United States, 731 F.2d 267, 276 (5th Cir. 1984); Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950).  A taxpayer must provide evidence of lack of potential as well as liquid value by yearend, and the taxpayer's unsupported opinion that the debt became worthless in a particular year, by itself, will not normally be accepted as proof of worthlessness.  See Dustin v. Commissioner, 53 T.C. 491, 501-502 (1969), affd. 467 F.2d 47 (9th Cir. 1972).

 B.  Analysis

 1.  Introduction

 In support of their entitlement to a 1997 bad debt deduction for the worthlessness of the $2 million loan, petitioners argue that, as of December 31, 1997:  (1) Solv-Ex was in bankruptcy in both the United States and Canada; (2) it had committed to sell all of its Canadian operating assets (plant and equipment) and

leases at a substantial loss; (3) it was insolvent; (4) its technology was without value; and (5) it had no past, present, or prospective future earnings; i.e., it had no "realistic, viable plan to pursue its business" other than the "incorrigible and hopeless optimism of its founder and chairman, John Rendall."

Although there is no doubt that Solv-Ex was in a serious financial bind and faced an extremely uncertain future as of December 31, 1997, for the reasons discussed infra we agree with respondent that "[t]he facts do not establish that all reasonable hope of any future satisfaction on the loan was lost in 1997".

2.  The Bankruptcy Reorganizations

Both the U.S. and Canadian bankruptcy proceedings constituted reorganizations, not liquidating bankruptcies.  When a bankruptcy reorganization (e.g., under chapter 11 of the United States Bankruptcy Code) continues without objection from the creditors of the bankrupt, there is a strong presumption that the reorganization is not hopeless and that the creditors will receive at least partial repayment of the bankrupt's debts.  See Mayer Tank Manufacturing Co. v. Commissioner, 126 F.2d 588, 591-592 (2d Cir. 1942); Barrett v. Commissioner, T.C. Memo. 1996-199, affd. without published opinion 107 F.3d 1 (1st Cir. 1997).  In the present case, that presumption is consistent with the evidence.

Although Solv-Ex was required to sell all of its Canadian operating assets and leases in order to raise cash, it still retained ownership of its hydrocarbon, mineral, and metal extraction technologies, numerous patents in the United States, Canada, and elsewhere covering those technologies, both for oil sands and oil shale (the retained technology), and land in Albuquerque, New Mexico containing a research facility, office space, a pilot plant, an acid plant, and machinery and equipment. It also continued to employ research engineers. The existence of those retained assets and personnel suggests that, as of the end of 1997, Solv-Ex was in a position to continue its attempts to become a successful operating company after it emerged from bankruptcy.

At trial, Mr. Rendall testified that the retained technology was not marketable as of December 31, 1997, because of his loss of credibility attributable to the SEC investigation. Mr. Rendall also testified, however, that the retained technology still had substantial intrinsic value which would become apparent to the marketplace once his credibility was restored through proven usefulness of the technology in extracting minerals. We interpret that testimony to be an acknowledgment by Mr. Rendall that the retained technology had potential value to Solv-Ex sufficient to enable it to emerge from bankruptcy as a viable company.

Mr. Rendall further testified that the patents were worthless without his knowledge "of how to make * * * [them] work." But, assuming arguendo that the patents were useless without Mr. Rendall's knowhow in exploiting them, it is undisputed that, as of December 31, 1997, Mr. Rendall was still the CEO of Solv-Ex, and that, in Mr. Rendall's own words, he and the patents were "united for [the] future."

Another reason for at least cautious optimism, as of December 31, 1997, regarding Solv-Ex's prospects for financial recovery was the potential commercialization of Solv-Ex's TiO2S technology (a titanium dioxide substitute for whitening paper and other materials, hereinafter included in the term "retained technology"). Mr. Rendall testified that they "had" the "product" in January 1998, that "it was an excellent product", and that, in February 1998, he went to Venezuela, where, the following April and May, he was able to enter into two MOU's with Venezuelan companies for the production and marketing of pigment using the TiO2S technology.[15]

---

[15] We infer from Mr. Rendall's testimony and from the representation in the amended disclosure statement filed in the U.S. bankruptcy proceeding on June 23, 1998, that aspects of the TiO2S technology had been "demonstrated previously in the Solv-Ex Research and Pilot Plant facility in Albuquerque" that the technology was either developed or in the final stages of development as of Dec. 31, 1997.

Solv-Ex's plan of reorganization was approved by both the U.S. and Canadian bankruptcy courts in 1998, whereupon Solv-Ex emerged from the joint bankruptcies and, thereafter, continued to operate. Moreover, under the plan, Mr. Rendall received 5,728,767 shares of new Solv-Ex common stock in discharge of the $2 million loan (plus interest). Because the number of shares Mr. Rendall received was based upon the actual bid price for Solv-Ex common stock on the date immediately prior to the date of receipt (50 cents a share), those shares obviously had a value greater than zero upon receipt by Mr. Rendall.

Lastly, Mr. Rendall testified at trial that the lawsuits commenced in 1998 against Deutsche Bank and others, after Solv-Ex's discharge from bankruptcy, entailed the potential recovery of $100 million for Solv-Ex.

Although the arrangements for commercializing the TiO2S technology in Venezuela, Solv-Ex's emergence from bankruptcy, the conversion to common stock of the $2 million loan, and the suits against Deutsche Bank and others all occurred in 1998, we may "take cognizance of subsequent events in confirming whether a debt becomes worthless in a particular year." Crown v. Commissioner, 77 T.C. 582, 600 (1981).

Petitioners have not persuaded us that the joint bankruptcies were identifiable events demonstrating the worthlessness of the $2 million loan as of December 31, 1997.

3. <u>Sale of Solv-Ex's Canadian Operating Assets and Leases</u>

Although Solv-Ex's forced sale to Koch of a 78-percent interest in its Canadian operating assets and leases was certainly a setback for the company, for the reasons discussed in the prior section, that sale (to which Solv-Ex was committed as of December 31, 1997) did not eliminate the realistic hope that Solv-Ex would be able to recommence operations in the future and become profitable.

In fact, the cash raised by that sale (and by Solv-Ex's sale of the remaining 12-percent interest in its Canadian operating assets and leases) helped enable Solv-Ex to discharge substantially all of its non-subordinate, non-debenture debts, thereby enhancing the prospects for its eventual recovery. Moreover, that is true whether the sale was at a gain, at break-even, or at a loss as petitioners allege.

We find that the anticipated sale of Solv-Ex's Canadian operating assets and leases was not an identifiable event indicating the worthlessness of the $2 million loan as of December 31, 1997.

4. <u>Insolvency</u>

As noted <u>supra</u>, there are no financial statements in evidence that reflect Solv-Ex's financial position as of December 31, 1997. The only evidence indicating Solv-Ex's insolvency as of that date is Mr. Ciotti's unsubstantiated trial testimony that

Solv-Ex's loss on its sale of Canadian operating assets and leases to Koch "resulted in a negative net worth from the Koch transaction of $13 million at December 31, 1997." The financial statements that are in evidence show Solv-Ex to have been solvent as of March 31, 1997, and insolvent by less than the $2 million owed to Mr. Rendall as of August 31, 1998. Neither Mr. Ciotti's testimony nor the balance sheets in evidence take into account Solv-Ex's off-balance-sheet assets (e.g., the retained technology), the value of which obviously would have had a favorable impact on Solv-Ex's financial condition at any point.

Even if Solv-Ex was technically insolvent at the end of 1997, there is no evidence that the insolvency was so extreme as to cause grounds "for abandoning any hope of recovery." Milenbach v. Commissioner, 106 T.C. at 205. A debtor's poor financial condition, including insolvency, does not establish that the debt is worthless, particularly where, as in this case, the debtor remains a going concern and there is a reasonable hope that its financial condition will improve in the not too distant future. See Roth Steel Tube Co. v. Commissioner, 620 F.2d 1176, 1181-1182 (6th Cir. 1980), affg. 68 T.C. 213 (1977); Riss v. Commissioner, 56 T.C. 388, 408 (1971), affd. in part, revd. and remanded on another issue 478 F.2d 1160 (8th Cir. 1973), affd. sub nom. Commissioner v. Transp. Manufacturing & Equip. Co., 478

F.2d 731 (8th Cir. 1973); <u>Trinco Indus., Inc. v. Commissioner</u>, 22 T.C. 959, 965 (1954).

Also, it does not appear that the unpaid $33 million Phemex loan was sufficient to cause Mr. Rendall to abandon all hope of recovery on the $2 million loan. In the amended disclosure statement, Solv-Ex represented that it was prepared to assert offsetting claims against Phemex and its affiliates, and, as of December 31, 1997, Phemex had not filed a proof of claim. As noted <u>supra</u>, Phemex did not file a proof of claim by the January 31, 1998, deadline and, therefore, waived its claim entirely.

Assuming arguendo that Solv-Ex was technically insolvent as of December 31, 1997, that insolvency was not an identifiable event indicating the worthlessness of the $2 million loan as of December 31, 1997.

5. <u>Whether Solv-Ex's Technology Was Without Value</u>

As discussed in section IV. B.2., <u>supra</u>, the evidence indicates that the retained technology had substantial potential value as of December 31, 1997. Therefore, it cannot be considered worthless as of that date.

6. <u>Absence of Prior Earnings or a Viable Business Plan for the Future</u>

a. <u>Absence of Prior Earnings</u>

A history of continuous operating losses, like insolvency, does not represent an identifiable event indicating the worthlessness of the loss corporation's indebtedness. As in the

case of insolvency, the argument against worthlessness is particularly strong when the debtor is still operating and is taking steps to become profitable. See Estate of Pachella v. Commissioner, 37 T.C. 347, 353 (1961), affd. 310 F.2d 815 (3d Cir. 1962); Trinco Indus., Inc. v. Commissioner, supra at 965; Ockrant v. Commissioner, T.C. Memo. 1966-60.

b.  Business Plan

As discussed supra, Solv-Ex presented a comprehensive business plan in the amended disclosure statement. That plan centered on the exploitation of the retained technology and was expected to generate a positive cash flow by 2000. The plan was a key component of the plan of reorganization that was approved by bankruptcy courts in both the United States and Canada. Although the evidence indicates that, as of the trial date (April 5, 2005), all efforts to bring that plan to fruition have been unsuccessful, it does not reveal the reasons for that lack of success. More significantly, there is no evidence that that lack of success was foreseeable when the plan was formulated during the period of the joint bankruptcies (July 1997 to July 1998). Certainly, the failure of what appeared to be a promising project in Venezuela for the commercialization of the Ti02S technology, caused by a change in the Venezuelan Government in late 1998, was unforeseen and was, in Mr. Rendall's own words, "a circumstance beyond my control." Moreover, the fact that Solv-Ex was still in

existence at the time of trial, with Mr. Ciotti rather than Mr. Rendall at the helm, indicates that, as late as April 2005, there was still some hope for Solv-Ex's financial success.

We find that petitioners have failed to present credible evidence in support of their argument that the plan of reorganization reflected nothing more than the "incorrigible and hopeless optimism of * * * John Rendall."[16]

C. Conclusion

None of the factors petitioners cite is sufficient, either alone or in combination, to establish (i.e., provide credible evidence of) the worthlessness of the $2 million loan as of December 31, 1997. Nor do we see any other basis for a finding of worthlessness. The sale by Merrill Lynch, as pledgee, of 634,100 shares of Solv-Ex common stock, the delisting of the stock from trading on the NASDAQ Small-Cap Market (events which depressed the stock's value, making it more difficult to raise capital through the issuance of new shares), the class action lawsuits, and Solv-Ex's SEC problems all may have combined to place Solv-Ex under extreme financial stress, but those events could not be viewed, on December 31, 1997, as necessarily eliminating, for all time, Solv-Ex's ability to discharge at

---

[16] See United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927) (in sustaining a loss deduction, the Supreme Court stated that "[t]he taxing act does not require the taxpayer to be an incorrigible optimist").

least a portion of the $2 million loan.  Petitioners have not provided credible evidence of worthlessness.

Because we hold that petitioners have failed to provide credible evidence that the $2 million loan became worthless in 1997, it necessarily follows that petitioners are entitled to neither a $2 million nonbusiness bad debt deduction nor a $2 million business bad debt deduction for the alleged worthlessness arising in 1997.

V.  Worthless Stock Loss

    A.  Law

    Section 165(g)(1) provides that, if any security that is a capital asset becomes worthless during the taxable year, the resulting loss shall be treated as a loss from the sale or exchange of a capital asset.  Section 165(g)(2)(A) provides that the term "security" includes stock in a corporation.

    The principles for establishing the worthlessness of stock in a particular taxable year are virtually identical to the principles for establishing a worthless debt.  Those principles are succinctly set forth in Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940), as follows:

> The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation.  Both factors of value must be wiped out before we can definitely fix the

loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.

There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock, for already "its value had become finally extinct." [Citations omitted.]

Thus, as in the case of a bad debt deduction due to the worthlessness of a debt, the taxpayer must show an absence of potential as well as liquid value by yearend in order to sustain a worthless stock loss.

B. <u>Analysis</u>

In support of their entitlement to a 1997 worthless stock loss, petitioners point to the same "identifiable events" that they relied upon in support of their claimed bad debt deduction: the joint bankruptcies, the alleged insolvency as of December 31,

1997, the sale of Solv-Ex's Canadian operating assets and leases, the alleged worthlessness of its technology, and the alleged absence of either present or potential future earnings. For the same reasons that none of the factors cited by petitioners is sufficient, either alone or in combination, to provide credible evidence of the alleged 1997 worthlessness of the $2 million loan (see section IV. B., supra), those factors fail to provide credible evidence of the alleged worthlessness of the Solv-Ex common stock Mr. Rendall held on December 31, 1997.

Petitioners also argue that, despite continued over the counter trading of Solv-Ex's common stock via the "pink sheets", Mr. Rendall's stock was worthless as of December 31, 1997, because of Solv-Ex's inability to file delinquent Forms 10-K and 10-Q and Mr. Rendall's status as an officer of Solv-Ex with "negative non-public insider information", both of which rendered Mr. Rendall's Solv-Ex common stock nontradable on the open market under Federal securities laws. Lastly, petitioners argue that the "pink sheet" value "would have applied to trades of very small lots of stock--100 to 200 share lots--and would have had no application to * * * [Mr. Rendall]."

There is no evidence, aside from Mr. Rendall's testimony, that he was prohibited from trading in Solv-Ex common stock as of December 31, 1997. Although the correspondence between counsel for Merrill Lynch and counsel for Mr. Rendall before the sale of

pledged shares by Merrill Lynch implies that, under SEC Rule 144, Mr. Rendall might have been restricted from selling his Solv-Ex shares, petitioners stipulated (without objection by respondent) that the correspondence was offered "for the limited purpose of showing the existence of a controversy over the sale of the stock [by Merrill Lynch], and not for the facts or legal opinions contained therein." Moreover, Mr. Rendall was not offered as a Federal securities law expert. Therefore, we find no credible evidence in the record that Mr. Rendall was restricted by law from selling his Solv-Ex shares over the counter as of December 31, 1997.

Nor have petitioners furnished any evidence in support of their claim that the "pink sheet" value of the Solv-Ex common stock as of December 31, 1997, $3 a share, bore no relationship to the market value of Mr. Rendall's shares on account of the small daily volume of trades. Even if we were to assume that Solv-Ex was trading in lots of 100 to 200 shares at the end of 1997, that fact would not establish the worthlessness of Mr. Rendall's shares at that time. See Jones v. Commissioner, 29 B.T.A. 928, 931 (1934) ("The fact that the petitioner could not find any purchaser for his shares at the time he offered them for sale is not conclusive evidence * * * that they were worthless"); West End Pottery Co. v. Commissioner, 7 B.T.A. 927, 929 (1927) (the lack of a ready market for stock does not establish

worthlessness); see also <u>Ginsburg v. Commissioner</u>, T.C. Memo. 1974-191 (stock's worthlessness rejected when based upon an SEC ban on the trading of the stock in the United States and the absence of any market for the stock).

Ginsburg indicates that, even if Mr. Rendall had been subject to SEC restrictions on selling his Solv-Ex common stock as of December 31, 1997, that fact would not constitute conclusive evidence of worthlessness.  We agree, because a contrary result ignores the potential marketability of the stock after December 31, 1997.  Assuming arguendo that the delinquent Forms 10-K and 10-Q and/or his insider status made it impossible for Mr. Rendall to sell his Solv-Ex shares as of December 31, 1997, it appeared probable at that time that Solv-Ex would be able to overcome those infirmities after 1997.  In fact, the amended disclosure statement specifically represents that "[t]he Company intends to file and expects that it will be able to file * * * [the delinquent] reports, or reports becoming due in the near future * * * following confirmation of the plan and completion of an audit."

Almost from its inception, Solv-Ex constituted a "development stage enterprise" within the meaning of FAS 7; i.e., a company that had not yet commenced its planned principal operations.  Yet, despite a more than 15-year absence of sales or profits, Solv-Ex common stock was trading at $16.25 a share on

December 29, 1995, as high as $38 a share during the quarter ended March 31, 1996, and at $14.375 a share as late as March 17, 1997.  Obviously, for many years, the market had been betting (with varying degrees of optimism) that Solv-Ex would be able to develop valuable technology, commercialize it, and eventually, generate sales and profits; and despite its many difficulties after Merrill Lynch's sale of the pledged shares in late May and early June 1997, at 1997 yearend Solv-Ex still retained its technology, and Mr. Rendall remained guardedly optimistic that Solv-Ex, by exploiting that technology, could overcome its difficulties and attain financial success.  The market, while understandably cautious, did not entirely disagree, as evidenced by the fact that the stock was still trading at $3 a share on December 31, 1997.  That guarded optimism as of December 31, 1997, based upon the potential commercialization of the retained technology, was merely an extension of the optimism that had always attended the market's estimate of Solv-Ex's prospects for financial success.  Investor faith in Solv-Ex's technology provided value for its common stock before December 31, 1997, and it continued to do so as of that date.  Moreover, after 1997, the market continued to believe that there was at least a slim chance of a turnaround for Solv-Ex, as evidenced in November 1998 by Solv-Ex's ability to raise $812,000 through a private placement of 1,624,000 shares of common stock and 919,400 warrants.

C.  <u>Conclusion</u>

Petitioners have failed to provide credible evidence that they are entitled to a deduction for the worthlessness in 1997 of Mr. Rendall's Solv-Ex common stock.

VI.  <u>Conclusion</u>

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.